Companies of the State of South Dakota. From adverse orders defendant appeals. Affirmed.

C. C. Caldwell, Attorney General, Lauritz Miller, Gardner & Churchill, and Gamble, Wagner & Danforth, for Appellant.

Bailey & Voorhees, Brown & Brown, French & Orvis, and Aikens & Judge, for Respondents.

---

## IN RE EGAN.

### (157 N. W. 310.)

(File No. 3819.   Opinion filed April 4, 1916.)

1. **Attorney and Client—Disbarment of Attorney—Misconduct—False Affidavit on Information and Belief, Stated Positively—Failure to Withdraw Affidavit.**

    The conduct of an attorney who made a false charge against opposite counsel in a case, which statement, although appearing from the whole affidavit and in the light of other matters known to trial court and attorneys, to have been on information and belief, was stated positively, and on his attention being called to the matter he neglected to change or to withdraw the affidavit but permitted it to remain a part of the record presented for use in the Supreme Court, held, to have been reckless and careless, and deserving of criticism and censure, but not necessarily corrupt or dishonest.

2. **Same—Disbarment—False Attachment Affidavit Charging Fraudulent Disposal of Property—Censurable Conduct.**

    An attorney who makes, and procures the making by his client of another false affidavit in attachment, charging that defendant therein disposed of property with intent to defraud creditors, having no sufficient reason for believing said statement to be true, is guilty of reckless conduct deserving severe criticism and censure, and while not requiring his disbarment, yet persistency in such unlawful practice might warrant suspension if not disbarment of the wrongdoer.

3. **Same—Disbarment—Exorbitant Attorney's Fees—Purchase of Client's Property—False Representations of Value of Property, and of Outcome of Probate—Dishonest and Fraudulent Conduct.**

Where an attorney contracted with the residuary legatee to represent him in connection with an estate for one-third of what the client recovered from the estate, and believed, from information received by him but not communicated to the client, that the will of the decedent would be probated by the executor, and that his own services would not be required, and that his client would receive therefrom between $6,000 and $10,000, and afterwards induced his client to dispose of his interest in the estate for $3,000 plus the alleged value of his legal services under the contract, he knowing at the time that the property could be sold for over $8,000, but withholding such information, and in order to effectuate the purchase, represented to his client that there was danger of the will not being sustained, held, that the evidence sustains conclusions of the referees in the disbarment proceedings, to the effect that the attorney's conduct was unprofessional, dishonest and fraudulent, that the evidence warranteed disbarment.

**4. Same—Accepting Money as Attorney's Fee from an Incompetent—Dishonest Conduct.**

Where such attorney, knowing that a prospective client was mentally unsound and incompetent to transact business connected with the subject of his imaginary troubles, induced the incompetent to pay him $275, and to execute to him a note for $1,000 secured by land mortgage, held, that a finding in a disbarment proceeding that such conduct was unprofessional and dishonest was justified.

**5. Same—Disbarment—Contract for Exorbitant Attorney's Fees—Enlarged Fee, Taking Advantage of Client's Distress—Fraudulent Checking of Client's Funds for Expenses—Unprofessional and Dishonest Conduct.**

Where such attorney contracted with a client to perform legal service in a pending divorce suit, and received $1,000, giving a receipt in which was a recital that if the suit was won and the offending party (a co-repsondent in a divorce suit) convicted, $2,000 more and expenses were paid him; and afterwards when the client was greatly distressed in mind because of anxiety as to custody of his daughter and his belief that the co-respondent was guilty of adultery with the client's wife, the attorney represented to him that he would require a further fee, and demanded $4,000 more, which was paid; the attorney subsequently checking out of the client's funds without his authority, $120, only $100 of which was returned, and afterwards rendered to the client a statement "to cash expended," aggregating nearly $500, most of the items in which were claimed for personal expenses, but which, upon objection being made by client, the attorney did not insist upon being paid; and the attorney testified falsely as to several matters in explana-

tion of his exaction of the absolute fee of $5,000 in lieu of the $1,000 fee previously paid and the contingent $2,000 fee per the agreement; held, that the referee's finding that such conduct was unprofessional and dishonest was sustained by the evidence; that such conduct required disbarment of the attorney.

6. Same—Disbarment—Contingent Fee Contract—Failure to Account for Funds Collected Under Judgment—False Statement of Expenses—Inadequate Deposit of Client's Funds—Fraudulent Withholding of Funds—Findings.

Where such attorney, after contracting with a client to receive one-third of what might be recovered out of court under his client's claim for damages for personal injury, or 50% if it should be recovered on trial in court if settlement could not be made, brought suit, and in a subsequent suit recovered judgment, and collected and received in satisfaction thereof about $2200, including certain costs, and thereafter rendered a statement of money which he claimed to have disbursed for the client in said suit, and offered to pay the balance of one-half of the amount of the judgment less interest thereon and the costs, which the client refused to accept, he demanding an itemized statement, and wrote several times demanding itemized statements and the money due; and afterwards the client employed other attorneys to collect said dues, and almost three months thereafter the attorney sent an itemized statement, and deposited in a bank to the client's credit the amount shown in said statement to be due, which amount the client refused to accept, and afterwards suit was brought against the attorney to recover same, which suit was dismissed for want of proper service of process; it appearing that one item of said statement was for $55 for services alleged to have been performed in the federal court by one who was the attorney's clerk, another of which was for "cash advanced," $150 of which item had not been so advanced, and other irregularities also appearing; held, that referees' findings in disbarment proceedings that the itemized statement was wrongfully padded by the attorney for the purpose of fraudulently withholding from the client moneys justly due him as proceeds of the judgment, and their conclusion that his conduct was dishonest, unprofessional and fraudulent, were justified by the evidence, and that his conduct warranted his disbarment.

7. Same—Disbarment—Unfit to Practice Law—Cancellation of License—Sufficiency of Evidence—Attorney's False Testimony.

In a disbarment proceeding, held, that a conclusion of the referees, that the conduct of the respondent as shown by the findings of fact, shows him to be a person unfit to practice as an

attorney at law, and that a judgment of cancellation of his license to practice law in this state should be rendered and entered, was warranted by the evidence; that the testimony of respondent himself discloses his possession of a consuming passion to enrich himself at the expense of, and regardless of the rights of, those who, reposing confidence in him, come to him as clients; that a most serious matter is that disclosed by the evidence—that the referees must have believed that respondent · testified untruthfully in regard to many material issues; and that the facts require judgment of disbarment.

Original proceedings in the Supreme Court, for the disbarment of George W. Egan. Respondent disbarred.

See, also, 36 S. D. 228, 154 N. W. 521.

*C. C. Caldwell,* Attorney General, and *Byron S. Payne,* Assistant Attorney General, for the prosecution.

*Aikens & Judge,* and *Muller & Conway,* for Respondent.

WHITING, J. This is an original proceeding seeking the disbarment of one George W. Egan, a duly licensed practitioner at the bar of this court. Our records show that respondent was first admitted to the bar of this court on November 17, 1907, such admission being subject to a condition expressed in the order of admission; that he was disbarred on October 10, 1908; that he sought readmission on June 22, 1909; that his petition was rejected December 1, 1909; that he again sought readmission on July 9, 1910; that the judgment of disbarment was modified so that he was readmitted on January 1, 1911; and that the present proceeding was instituted by a petition filed in this court on May 14, 1915. This proceeding is now before us upon a motion to affirm the report of the referees and to enter judgment in conformity with the recommendations of such report. We deem the facts revealed upon the hearings of the original petition for admission, the original disbarment proceeding, and the two applications for reinstatement all material and pertinent to the consideration of the motion now before us. No comprehensive statement of such facts can well be made at this time, as to incorporate them herein would unduly extend this opinion. Reference is therefore made to the statements of facts found in the several opinions of this court. In re Egan, 22 S. D. 355, 117 N. W. 874; In re Egan, 24 S. D. 301, 123 N. W. 478; In re Egan, 27 S. D. 16, 129 N. W. 365. The three members of this court

who were then members desire to state that it was with much hesitancy, and with a feeling that its better judgment was perhaps being unduly influenced through sympathy for the respondent, and yet prompted somewhat by the fear that, in case it refused his petition, it might do injustice, that this court, upon the second petition for readmission, determined to err, if it erred at all, on the side of mercy. While it fully realized the gravity of respondent's past offenses, it yet hoped that his protestations of reformation and regret for the past, as declared in his petition and his sworn statements in open court, were sincere, and that his future record as an attorney at law would justify its action. It was in such a spirit and prompted by such a hope that this court, speaking through Justice Haney, than whom few men ever suffered greater wrong from another than he had from respondent, said:

"Undoubtedly he has disregarded his duty as an attorney and counselor at law; his duty as a citizen. Nevertheless, assuming the good faith of his present attitude, appreciating the consequences to him of continued exclusion from his chosen profession, possessing the power to correct the mistake if time shall reveal that one has been made, and hoping the exercise of clemency may broaden the petitioner's charity towards his fellow men, the court concludes, without receding in the slightest degree from either of its former decisions as to the fitness of the petitioner to practice law when such decision was rendered, that he should now be given an opportunity to demonstrate the genuineness of his reformation."

At the primaries in 1910, and again in 1912, respondent sought nomination as a candidate for the office of governor. His experiences before the bar of this court were thus brought into prominence before the people of the whole state. It was prior to and in the 1910 campaign that he made the charges, recorded in In re Egan, 24 S. D. 301, 123 N. W. 478, to the effect that the original disbarment proceeding was of political origin and the judgment of this court therein prompted by corrupt political motives. The vote received by him at such primaries was proof that many of the people of this state must have given credence to such charges. At the time the present proceeding was instituted it was commonly reported that he would again in 1916 seek

nomination as a candidate for the governship. Considering all of the above facts, and believing that it would promote more widespread confidence in the results if the trial of the issues raised was referred to three referees instead of one, as has been the previous custom of this court in disbarment matters, we felt called upon to and did refer such issues to a board of three referees. To insure the selection of referees acceptable to both respondent and the Attorney General, the court requested respondent to and he did furnish a list of names of those acceptable to him. From the names so furnished the Attorney General selected those that would be acceptable to him, and from names so selected a board of referees was finally chosen, consisting of A. W. Campbell, of Aberdeen, A. H. Orvis, of Yankton, and Chambers Kellar, of Lead. It is the report of this board of referees, in whose ability and integrity of purpose every member of this court, and we feel certain the people at large, have absolute confidence, that we are called upon to consider. To the affirmance of such report counsel for respondent have filed certain written objections, which objections are almost entirely directed to the sufficiency of the evidence to support the referees' findings of facts.

Unprofessional conduct in relation to nine different matters was charged against respondent. As to one of these matters no evidence was offered in support of the charges. As to two other matters the referees found in favor of respondent, and, inasmuch as the prosecution has not asked that these findings be set aside, it becomes unnecessary for us to, and we therefore do not, express any opinion upon the correctness of these particular findings.

A vast amount of evidence, the transcript of which comprises some 1,000 pages of typewriting, was submitted upon the issues raised on the other charges. We have gone through such evidence with great care. While there is an irreconcilable conflict therein upon many matters, and different findings upon minor matters—in some instances favorable and in others unfavorable to respondent—would find such support as to warrant our affirmance thereof if they had been returned, yet the referees had the opportunity of seeing such witnesses as appeared before them, and their appearance upon the witness stand certainly assisted such referees in determining the credit that should be given to

their words.  There is no finding in relation to any one of these charges that is not supported by ample evidence.  A review of such evidence could not be made in an opinion of reasonable length, and such a review could serve no useful purpose. The findings themselves comprise some 20 pages of typewriting. We shall not attempt to even set the findings out in full, but shall merely state the substance of such findings as we feel are particularly material to the motion before us, using care, however, to refer to everything therein in any manner favorable to the respondent.

[1]  Svendsen Charge.  Through the failure of his clerk to follow directions given by respondent, and through respondent's failure to read a certain affidavit before executing and filing same, respondent unwittingly filed, in the case of Svendsen v. Svendsen, then pending in the trial court, an affidavit in which it was charged positively, instead of upon information and belief, as intended by respondent, that opposing counsel had, by the payment of a money consideration, procured a false affidavit, and had filed the same in such court.  Respondent's charge against such opposing counsel was false in fact.  The fact that respondent's charge was in reality based upon information and belief was apparent from a reading of the whole affidavit in the light of other matters known to the trial court and attorneys.  When, upon the hearing of the motion upon which respondent's affidavit was filed, respondent's attention was called to the fact that his allegations therein were positive, and not alleged to be upon information and belief, he did not "ask to correct such affidavit or to withdraw the same, but permitted it to remain without objection as a part of the record in said action prepared for use in the Supreme Court, and is now a part of the record in said action before said court."  The referees conclude that respondent's conduct "was reckless and careless, and was such as deserves criticism and censure, but was not necessarily corrupt or dishonest."  With this conclusion we fully concur.

[2]  Case Charges.  In one action respondent himself made, and in another action he prepared and his client made, an affidavit for attachment wherein it was falsely charged that the defendant therein "has sold and disposed of part of his property and is about to assign and dispose of his property with the intent to

defraud his creditors, and said affiant deposes and says that said
plaintiff is in danger of losing its said claim by reason of the
facts aforesaid unless a writ of attachment issues." Such affi-
davits were made and used when respondent had "no sufficient
reason for believing said statements to be true." The attachments
were levied upon the home of the defendent, when defendant was
the owner of a large amount of both real and personal property
located in the same county, and not exempt from levy, all of
which might readily have been learned by respondent by a search
of the records or by inquiry in the office of the register of deeds
of such county. The defendant in said actions thereafter brought
an action against respondent and his clients to recover damages
alleged to have resulted from the above wrongful acts. The
verdict in such action was in favor of respondent. The referees
conclude that respondent's conduct "was reckless, and the same
deserves severe criticism and censure, but his license to practice
as an attorney at law in the state of South Dakota should not be
canceled by reason of said conduct." With such conclusion we
agree. The law provides some harsh weapons to be used as
necessary remedies under extraordinary occasions. We regret
to say that there are a few lawyers, who "are the scandal of
the profession, who act upon the assumption that the end of the
client's interest or desire justifies the use of any means to further-
er it." No attorney—no matter how just he believes the end
sought to be, no matter how insistent his client may be—has any
right to use or to direct the use of these extraordinary weapons
on behalf of a client, unless he has reasonable cause to believe
the occasion one contemplated by the laws authorizing the use
thereof. Persistency in such unlawful practices might well war-
rant suspension, if not disbarment, of the wrongdoer.

[3] Kickland Charge. The matters charged under this
heading all relate to the acts of respondent when acting as attor-
ney for one Theodore Kickland. The evidence submitted was
mainly portions of the transcripts of evidence received in the case
of Kickland v. Egan, which was appealed to this court, our op-
inion being reported in Kickland v. Egan; 36 S. D. 428, 155 N. W.
192, to which reference is made for a general understanding of
the facts as revealed by the evidence in that case. Some further
evidence in relation to an action started by respondent against

Kickland and others in this state, and in relation to an action brought by Kickland against respondent in the state of Ohio, was received by the referees. On May 31, 1911, respondent was the attorney for Kickland, and during several months prior thereto had been consulted by his client in relation to certain tranactions between such client and one Lafayette Kickland. On that date respondent was employed to represent this client in connection with the estate of said Lafayette Kickland, which was about to be probated in Ohio. Such employment was evidenced by a written agreement providing that respondent should use his own judgment as to the manner in which he should look after his client's interest in such estate; should pay his own expenses in connection therewith; and should receive one-third of any sum or property his client should recover out of said estate. Respondent and his client both knew that such client was the residuary legatee named in the will of Lafayette Kickland and that Lafayette Kickland was dead. Respondent had knowledge and information received from Ohio lawyers, and which he did not communicate to his client, that the will of deceased was in due form and would in all probability in due time be probated; that the same would be sustained by the probate court; that his client would receive out of such estate between $6,000 and $10,000; that said will would be probated and fully looked after by executor therein named, and the expenses of the probate proceedings and fees of attorneys in Ohio on behalf of the estate paid from the residuary estate of respondent's client; that there was no occasion for the employment of any South Dakota attorney or any other attorney other than those employed or to be employed by the executor; and that the services to be performed by respondent, if any, in looking after his client's interests in said estate, would be nominal. On September 1, 1911, respondent induced his client, for a consideration of $3,000, to execute and deliver to him a deed and bill of sale whereby such client conveyed and transferred to respondent all the interest the client had in such estate. The property so sold and conveyed was of the value of over $8,000, which fact was then known to respondent, but not to his client. At the time of the purchase of his client's interest in such estate respondent had reason to believe, and did believe, that the will would be sustained, and that the prop-

erty could be sold for an amount in excess of $8,000; but, in order to effectuate such purchase for $3,000, respondent represented to his client that he believed there was grave danger said will would not be sustained, and he withheld information then possessed by him to the effect that said property was worth and could be sold for more than $8,000. In the spring of 1913 Kickland employed Ohio attorneys for the purpose of recovering back the property conveyed to respondent. When respondent learned of this fact, he, for the purpose of intimidating said Kickland and thereby preventing him from causing an action to be instituted to recover such property, commenced an action against said Kickland, his wife, and a son, in a circuit court of this state. The referees conclude that the conduct of respondent in the Kickland matter "was unprofessional, dishonest, and fraudulent."

Hatland Charge. On January 28, 29, and 30, 1915, one Jacob Hatland had a number of interviews with respondent at respondent's office. Hatland was at that time insane, suffering from a type of insanity known as melancholia, with delusions; and he sought to employ respondent to protect him from people whom he could not and did not name, but who he imagined were, as he stated, "after him, talking about him, and trying to get him." The referees found that at the time of the above-mentioned interviews respondent knew Hatland was mentally unsound and incompetent to transact any business connected with the subject of his imaginary troubles. Upon said dates respondent induced Hatland to pay to him $275 and to execute to him a note for $1,000 with a mortgage securing the same upon land owned by Hatland. Soon thereafter Hatland was adjudged incompetent, and a guardian of his person and estate was appointed and qualified. About February 16, 1915, respondent, through a newspaper article, was advised that Hatland had been adjudged incompetent and a guardian appointed. On February 27, 1915, a written notice and demand, signed by such guardian, was served on respondent, advising respondent that the signer had been appointed guardian; charging that respondent had procured such money, note, and mortgage through fraud; and demanding the payment to such guardian of such money and the return of the note and mortgage. This notice and demand were ignored by respondent.

Thereafter the guardian commenced an action to recover $1,275, the amount of the money and note procured as above. Respondent appeared in said action and moved the court to require plaintiff to make his complaint more specific. This motion was denied. Respondent then demurred to the complaint; the demurrer was overruled, and respondent appealed to this court. Respondent performed no legal services whatever for Hatland other than consulting him on January 28, 29, and 30, 1915. The referees concluded that the conduct of respondent in the Hatland matter "was unprofessional and dishonest."

Renner Charge. On March 14, 1914, respondent was retained by one Renner to represent Renner in a divorce action then pending against him, and which was brought to recover a divorce, alimony, and custody of a minor child. At the time of such employment, respondent was paid $100 as a retainer fee. On April 4, 1914, respondent received from his client the further sum of $900. At the time of this last payment respondent gave his client a receipt as follows:

"Sioux Falls, S. D., April 4, 1914. Received of Wm. A. Renner $900 for bal. of retainer in legal matters. If case is won and offending party convicted, $2,000.00 more and expenses to be paid. Otherwise this is full fee in Renner v. Renner. George W. Egan."

The "offending party" referred to in the receipt was a man who Renner believed guilty of adultery with his wife. Renner was anxious to convict this party of adultery, and was also much concerned over the custody of the child, being very anxious to have her custody. On May 16, 1914, at a time when respondent knew that his client was greatly distressed in mind on account of his anxiety as to the custody of his daughter, and on account of his belief that a certain man was guilty of adultery with his wife, respondent represented to his client that he would be unable to perform the services desired by such client in said action and pay his own expenses unless a further and larger fee should be paid; and he demanded a further payment of $4,000, which sum the client then and there paid, partly in cash, and partly by note, which note was afterwards paid. At said time respondent gave to his client a receipt as follows:

"Sioux Falls, S. D., May 16, 1914. Received of W. A.

Renner full for all atty.'s fees and expenses in Renner v. Renner, part pd. in cash, part by note due November 1, 1914. Geo. W. Egan, per Sese."

The divorce action was tried, and resulted in a judgment against respondent's client. Soon after respondent's retainer by Renner respondent was authorized to check against Renner's bank account to pay alimony to Mrs. Renner and attorney fees to her attorneys. Thereafter respondent, without authority from his client, drew four checks aggregating $120.50. These checks were paid by the bank and charged to Renner's account. The amount of one, $100, was afterwards repaid Renner by respondent. On December 14, 1914, respondent, further attempting to obtain unprofessionally, dishonestly, and without consideration additional money from his said client, forwarded by mail to his client a statement of cash alleged to have been expended by respondent on account of said action; such statement consisting of 95 items, aggregating $495.63, all of which items, except one, consisting only of date, the charge "To cash expended," and the amount of the charge. Accompanying this statement was a letter reading:

"Sioux Falls, South Dakota, December 19, 1914. Hon. W. A. Renner, Wentworth, S. D.—Dear Will: I have asked Mr. Shurtleff to make out an itemized statement of the amount of money I have paid out in your case since the case was started, and he has made it out, and inclose the same herewith. Now, Bill, I just must have this money, for I have a number of bills I must meet, and people are urging me. It is not attorney's fees, but cash I have paid out for you. I wish you would go up to your bank and borrow the money and send me a check. I have filled out a check for the amount of the bill, and you just sign it and return it to me by return mail in the inclosed stamped envelope, and then tell the bank to take care of it. This will be a big favor to me. Thanking you in advance, I am, respectfully George W. Egan. Dict. by G. W. E. but not read. W. H. S."

Most of the items in said statement were for claimed personal expenses of respondent, and, when Renner objected to paying same, respondent did not insist that he pay them. The referees found that respondent testified falsely as to several matters which were offered by respondent in explanation of his

exaction of the absolute fee of $5,000 in lieu of the fee of $1,000 previously paid and the contingent fee of $2,000 as per the first agreement, and as to several matters in explanation of his attempt to obtain from his client the alleged expenses covered by the two items of $120.50 and $495.63 above mentioned. After the decision in the divorce action in the trial court respondent offered to pay for a transcript of the evidence and to give his future services for nothing if Renner would pay the other costs of an appeal to this court. Renner offered to pay respondent $1,000 provided respondent would take the appeal and won the case in this court. This proposition respondent refused to accept. Respondent never offered to take an appeal to this court and pay the expenses thereof from the $5,000 fee previously received. The referees concluded that the conduct of respondent in the Renner matter was "unprofessional and dishonest."

Perreault Charge. On May 22, 1911, one Perreault employed respondent to represent him in an action to be brought against the Wisconsin Granite Company. Such employment was evidenced by a contract in writing as follows:

"Contract and Agreement.

"Made and entered into this 22d day of May, 1911, by and between Urbain S. Perreault, party of the first part ,and George W. Egan, party of the second part, witnesseth: Party of the first part this day employs George W. Egan, party of the second part, to be and appear for him as his attorney and counselor at law, in a suit against the Wisconsin Granite Company, for personal injuries to his left limb and foot, and turns over to the said George W. Egan the full and complete control and management of said case, and agrees to follow his advice in the conduct of the said trial or settlement of said suit.

"And for the said services to be well and truly performed by the said George W. Egan, party of the second part, the party of the first part, Urbain S. Perreault, hereby agrees and by these presents binds himself to pay unto the second party, George W. Egan, the following share or per cent. of amount recovered, either by suit or settlement: .

"George W. Egan is to have one-third of what may be recovered, if a satisfactory settlement can be made out of court,

and, if said case is tried in court, then George W. Egan, instead of one-third, shall have 50% of whatever may be ultimately recovered.

"George W. Egan is to pay his own expenses, and if no recovery is had, either by suit or settlement, then George W. Egan is to charge no fees, and first party, Urbain S. Perreault, shall be in no wise indebted to George W. Egan.

"George W. Egan on his part agrees to give sufficient time and his best energy and ability to the prosecution of said claim, either by suit or settlement.

"Dated at Sioux Falls, S. D., this 22d day of May, 1911.

"Urbain S. Perreault, First Party.
"Geo. W. Egan, Second Party."

Pursuant to such contract, respondent instituted an action in a circut court of this state; such action, on motion by defendant therein, was afterwards transferred to the United States District Court, where a demurrer to the complaint was sustained, and later the action dismissed. Subsequently and pursuant to the said contract a new action was instituted in the state circuit court, was tried, and resulted in a verdict and judgment for plaintiff. Upon appeal to this court such judgment was affirmed, and on or about November 3, 1913, respondent, as attorney for Perreault, received in satisfaction of such judgment a draft for $2,219.55. This amount included costs in this and the circuit court, as well as interest on the judgment—the amount of recovery, exclusive of costs and interest, being $1,990. Respondent presented to his client a statement of moneys which he claimed to have paid out on behalf of such client on account of said action, and offered to pay the balance of one-half of the $1,990, and interest. Perreault refused to accept the offer and demanded an itemized statement of the account. Perrault wrote respondent several times asking for such itemized statement and for the money due him; and respondent replied to the letters promising to have such statement prepared and sent to Perreault. Finally, under date of December 21, 1913, respondent wrote Perreault as follows:

"I have been away from my office for some time, and have had no opportunity to answer your letter until now. I did not like the tone of your letter, and, as I have stated before, I have the

money here, and any time you want it you can call for it."

Perreault afterwards employed attorneys at Elk Point, S. D., Perreault's home, to collect what was due him from respondent. These attorneys corresponded with respondent, and finally, almost three months after his client had first demanded it, respondent sent an itemized statement to the said attorneys. He deposited the balance shown thereby to the credit of Perreault in a Sioux Falls bank, and sent a duplicate deposit slip to his attorneys. Perreault directed the return of the deposit slip, and refused to accept the amount thereof in settlement of his claim. Perreault, through his attorneys, instituted an action against respondent in the district court of Woodbury county, Iowa, to recover from respondent the amount claimed to be due, $1,058.85. Respondent procured the dismissal of such action upon the ground that the original notice therein was served upon him at Sioux City at a time when he was privileged from the service of process. Respondent soon thereafter commenced an action against Perreault and his attorneys seeking to recover damages in the sum of $15,000 claimed to have been suffered by reason of the commencement of Perreault's action against respondent. This action is now pending. Among the items wrongfully charged against Perreault in the itemized statement furnished was one of $55 for services alleged to have been performed by one E. E. Pierson in the United States court. At the time such services were rendered Pierson was a law clerk in respondent's office. Another item wrongfully charged against Perreault was $180, stated to be "for cash advanced while case was pending." The only money so advanced was one item of $20 which had been repaid prior to the collection of Perreault's judgment. Twenty-five dollars was charged for "expert fees, for expert evidence, paid by George W. Egan," and another $25 for moneys stated to have been paid "Dr. M. H. Egan, physician's fees for examination, paid at direction of Perreault." Twenty-five dollars was paid Dr. Egan as an expert witness; the other charge was wrongful. Ten dollars was charged for "opinion on case at Elk Point." No opinion was ever asked for; but Perreault once had a casual conversation with respondent in relation to such case. There was a charge of $10 for "special counsel fees, cash paid by George W. Egan," but which fee was never paid by respondent. Respondent has at all

times since collecting Perreault's judgment "been indebted to said Perreault in a sum greatly in excess of the amount of money deposited in the Sioux Falls Savings Bank to the credit of Perreault." The itemized statement rendered Perreault's attorneys by respondent gave no credit for costs collected by respondent as a part of the judgment against the Granite Company. There was $91.55 taxed in this and the circuit courts, of which $36 was statutory fees not representing disbursements. The referees found:

"That the said statement of account, Exhibit 23, was wrongfully and deliberately padded by the said Egan with the express purpose of wrongfully and fraudulently withholding from his client, the said Perreault, moneys justly due him as the proceeds of said judgment."

And they concluded that respondent's conduct in relation to the Perreault matter "was dishonest, unprofessional, and fraudulent."

The ultimate question presented to the court in a disbarment proceeding is:

"Do all the facts established by the evidence prove to the satisfaction of the court that the respondent is unfitted to be an attorney at law?" In re Egan, 36 S. D. 228, 154 N. W. 521.

The referees concluded:

"That the conduct of the respondent, George W. Egan, as shown by the findings of fact relating to the Kickland, Hatland, Renner, and Perreault charges, shows the respondent, George W. Egan, to be a person unfit to practice as an attorney at law, and a judgment canceling his license to practice law in the state of South Dakota should be made and entered in this proceeding."

With such conclusion we fully agree. The evidence in this case, even that of respondent himself, discloses that respondent is possessed of a consuming passion to enrich himself at the expense of, and regardless of the rights of, those who, reposing confidence in him, have come to him as clients. It was this weakness that led to his previous disbarment. In re Egan, 22 S. D. 355, 117 N. W. 874. It is this weakness that, even accepting his version of the Hatland matter as true, kept him from seeking out the guardian of Hetland as soon as he learned of his appointment, and, before any demand was made, voluntarily restoring to

him the money which he had not, and under the existing circumstances could not have, earned. It is this weakness which, even accepting his version of the Kickland matter, caused him to take from Kickland a contract under which he believed he would receive not less than $2,000 for merely nominal services. It is this weakness that, accepting his version of the Renner matter, caused him to extort from Renner, when Renner was under a great mental strain, $4,000 to which he was not then, and never afterwards became, entitled. It was this weakness which, even under his version of the Perreault matter, caused him to require from Perreault, as a condition precedent to instituting the second action in the state circuit court, a new and oral contract radically different from the written one theretofore entered into and which he must have known was binding upon him, and which caused him to fail to credit to his client all that to which he was entitled to credit even under such alleged oral contract. One of the most serious matters presented to us is disclosed by a comparison of respondent's sworn testimony with the facts found by the referees. Such comparison discloses that the referees must have believed that respondent testified untruthfully in regard to many of the material issues herein.

That the facts require a judgment of disbarment is too clear to justify our extending this opinion by the citation of authorities to support such conclusion. If authorities are desired, they will be found cited in the numerous cases hereinbefore mentioned wherein respondent has been before this court in matters pertaining to his disbarment. When respondent last sought readmission to practice, he in open court stated that he wanted "a chance to come back. * * * If you give me the right to practice law, you will have no reason to regret it." The chance was given, but respondent has proven himself unworthy the mercy shown him; he has given to those who thus trusted him ample cause to feel that they committed a great wrong to the people of this state when they the second time placed in his hands authority to act as an officer of the courts of this state. It is with a full realization of all that our decision means to respondent that we now affirm the report of the referees and adjudge that respondent's license be canceled and his name

stricken from the list of the attorneys of this state, and he be required to pay the costs of this proceeding.