DICKSON et al., Appellants, v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

(161 N. W. 813.)

(File No. 4012.   Opinion filed March 22, 1917.)

---

In re EGAN.

(161 N. W. 1003.)

(File No. 3819.   Opinion filed March 22, 1917.)

1.   **Disbarment—Reinstatement to Practice—Certificates, Fitness to Practice in Another State, Effect.**

In a proceeding for reinstatement of a disbarred attorney, held, that certificates supporting the petition, signed by members of the bar, business men, and county officials, reciting that

the signers are advised that petitioner "is desirous of making
his permanent residence in the city of Chicago, with a view of
practicing law in the state of Illinois," and that they believe
him to be "a fit person to practice law," are insufficient and
savour somewhat of a contract or understanding, in that the
signers thereof signed the same with the understanding that
petitioner would **permanently** leave the state of South Dakota;
in other words that, in their opinion, he would be a qualified
and fit person to practice law in the state of Illinois; that his
qualification to practice law in Illinois is matter of no concern
whatever to this Court; it being a matter solely to be consid-
ered by the Courts of Illinois, should they ever be called upon
to determine that question; and it would be matter of unques-
tionable impropriety for this Court to reinstate petitioner solely
on the ground that he intended **permanently** to leave this state.

2. Attorneys—Disbarment—Application for Reinstatement—Show-
    ing of Fitness to Practice Law—Good Moral Character, Nec-
    essity of Showing—Burden and Degree of Proof.

    Where, after repeated judgments of disbarment against an
attorney, he applies for an order canceling and vacating the
former judgment of disbarment and cancellation of his license
to practice law, and restoring his rights and privileges as an
attorney and counsellor at law, and files a petition for re-in-
statement to the effect that the signers thereof "are advised
and understand that * * * he is desirous of making his per-
manent residence in the city of Chicago with the view of prac-
ticing law in the state of Illinois;" that they "are well and
intimately acquainted with said * * * and have observed his
life and conduct since April 4, 1916, and said * * * is now in
our judgment a fit and proper person to practice law, possessing
all the qualifications required by our statute," and another
petition in substantially the same form and containing the ad-
ditional statement that the signers "would be pleased to see
him reinstated to all the rights of a lawyer and counselor at
law," and no other showing of any kind or character was made
in connection with the petition, **held**, that on disbarred attor-
ney's application for reinstatement, while the character of the
misconduct for which he was disbarred, the circumstances at-
tending his offense, his previous and subsequent conduct and
his present attitude toward the Court are to be considered, yet
the ultimate and decisive question is whether applicant is of
good moral character and a fit and proper person to be en-
trusted with the privileges of the office of an attorney, and
whether granting his application would probably promote the
administration of justice. That to persuade the Court to re-
instate an attorney, it must appear that his reinstatement will
not be incompatible with proper respect of the Court for itself,

and a proper regard for the dignity of the profession; and a disbarred attorney seeking reinstatement must satisfy the Court that he is a person of good moral character; and he has this burden whether or not opposition is made to his application; and the proof must be persuasive enough to overcome the Court's former adverse judgment of the applicant's character.

3.  Same—Disbarment—Reinstatement—Findings of Former Judgments of Disbarment, Undesirable Associate of Attorneys; Dangerous to Clients; Abuse of Adjudicating Judges, Consideration of, In re reinstatement—Apologies to Court, Retraction of Abusive Charges, Modifications of Judgment in View of, Subsequent Persistence in Unprofessional and Corrupt Practices, Followed by Second Disbarment—Publication of Unwarranted Statements of "Unscrupulous Politicians" as Instigators of Disbarment Procedure—Failure to Restore Fees Fraudulently Obtained from Clients—Failure to Promise Change in Professional Conduct—Inadequate Grounds for Reinstatement.

In an application to the Supreme Court for reinstatement of petitioner as an attorney at law, it appearing that under the first of two judgments of disbarment against him, his conduct was found to be such as to render him an undesirable associate of members of the bar, and dangerous for clients who might seek his assistance as an attorney, that to permit accused to longer remain an officer of the Court would lower the standard of professional conduct, and encourage younger lawyers to pursue an unwarranted course; that thereafter, as the result of an election contest involving his election as state's attorney, and after rendition of an adverse judgment therein, which judgment was affirmed on appeal, he immediately thereafter indulged in villianous published abuse of the Judges of the Court who participated in such decisions; that a subsequent petition for reinstatement was denied by the Supreme Court principally because of his said abuse of the said Judiciary; that thereafter he again petitioned for modification of the existing judgment of disbarment on the ground that he had no means of procuring a livilihood, and confessing the prior misconduct toward the Judiciary and as a member of the legal profession, and making full apologies therefor, and making full retraction of previous charges derogatory to the Court and Judges, upon which petition the Court modified its former judgment of disbarment so as to operate as a suspension from practice for a certain period, the Court professedly proceeding in a spirit of clemency toward him, but "without receding in the slightest degree from either of those former decisions as to the fitness of the petitioner to practice law when such decisions were rendered," and with many misgivings, but still with the

hope that the petitioner had been reformed, etc.; that notwithstanding said modified decision, applicant still persisted even to a more flagrant degree in the same general unprofessional, fraudulent and corrupt practices; that subsequently another complaint for his disbarment was filed, charging him with fraudulent and corrupt practice as an attorney in connection with some nine different charges of unprofessional conduct, involving dishonest and fraudulent relations to various clients, and procuring fees from them, under false representations concerning their rights and the services he would be obliged to perform for them, as found by three referees, attorneys of high moral standing, well known throughout the state, it appearing that immediately after filing of said last petition accused sent telegrams and letters to presiding Justice of the Supreme Court and also published as advertisements in newspapers that said procedure was instituted by "unscrupulous politicians" for the purpose of injuring him in his candidacy, the testimony failing to reveal any such motive; that accused in connection with said last disbarment proceeding abused and maligned the Attorney General during its prosecution; that no showing whatever was made that petitioner has made restitution to either or any of four of said clients of the sums fraudulently and dishonestly obtained from them, or that he has in any manner attempted to undo or right the wrongs he perpetrated against them; it further appearing that there is now pending in the Supreme Court an action wherein petitioner is appellant, and in which action the guardian of an incompetent, who was one of accused's clients, is endeavoring to recover from him the sum of money found by the referees to have been obtained from the client; there being before the Court no hint, or promise or intimation on petitioner's part that he in future will change his course of conduct from that of the past; and there being no showing indicating or tending to prove that the Court was wrong in its conclusion as to the character of applicant, in the judgment of disbarment last entered, nor by way of newly discovered evidence or otherwise that there was any mistake or error in said findings of referees, nor any showing that petitioner since said judgment of disbarment has in the slightest degree reformed; held, that, judging from past experience and all the records upon which the Court is proceeding, he has no intention of so doing. Held, further, that no ground whatever exists for reinstatement of petitioner as an attorney at law; that the Court would be wholly remiss in their duties as public officials of the state, were such reinstatement to be made.

4.  **Same—Disbarment—Reinstatement—Duty of Judiciary—Continuation of Attorneys' Misconduct—Protection of State and Public.**

It is the duty of the Judges of the Supreme Court to condemn conduct on the part of attorneys which tends to impair or defeat the administration of justice, or to degrade and imvair the usefulness of the legal profession; to protect the state and public from lawyers who prostitute the authority given them for their own personal gain by imposing orf or. defrauding clients, who impose upon the tribunals instituted to administer lay, and who fail to protect rights and interests committed to their care.

Original proceedings in the Supreme Court. Upon application of George W. Egan, a disbarred attorney, for reinstatement as an attorney at law. Application denied.

See, also, 24 S. D. 301, 123 N. W. 478; 27 S. D. 16; 37 S. D. 159, 157 N. W. 310.

*George W. Egan,* per se.

McCOY, J. On the 26th of January, 1917, the petitioner, George W. Egan, caused to be filed a motion asking the court to make and enter its order canceling and vacating the order and judgment of disbarment, canceling his license to practice law within the state of South Dakota, entered on the 4th day of April, 1916. On January 27, 1917, the court entered its order denying said motion reciting that no showing had been made that applicant is a fit and proper person to be admitted to practice law in this state. Petitioner again on the 10th day of March, 1917, filed another motion and petition asking this court to enter its order canceling and vacating the said judgment of disbarment entered on the 4th day of April, 1916, and that the petitioner be restored to all his rights and privileges as an attorney and counselor at law, "with the same force and effect as if said order had never been entered, for the reason that the petitioner has been severely punished and suffered great pecuniary loss because of said order, and because the ends of justice will be subserved by its vacation." Along with his petition for reinstatement the petitioner filed two certificates, the first of which was signed by 52 members of the Minnehaha county bar, reciting:

"That we are advised and understand that George W. Egan is desirous of making his permanent residence in the city of Chicago, with the view of practicing law in the state of Illinois; that we are well and intimately acquainted with said George W. Egan, and have observed his life and conduct since April 4, 1916, and said Egan is now, in our judgment, a fit and proper

person to practice law, possessing all the qualifications required by our statute."

The second certificate was signed by about 250 persons consisting of county and city officials, business men, and corporations of Minnehaha county, and which certificate recited:

"That we are well and intimately acquainted with George W. Egan, who we are advised is desirous of making his permanent residence in the city of Chicago, with a view of practicing law in the state of Illinois; that from our acquaintance and knowledge of the attainments, life, character, and ability of said George W. Egan, we believe him to be a fit person to practice law, and would be pleased to see him reinstated to all the rights of a lawyer and counselor at law."

No other showing of any kind or character has been made in connection with this petition for reinstatement. We quote from page 1332, vol. 2, Thornton on Attorneys at Law, the latest authority and exposition of the law upon that subject, as follows:

"It is generally held that a court which has power to disbar an attorney has power to reinstate him on good cause shown, and in a number of instances courts have exercised this power. On a disbarred attorney's application for reinstatement, the character of the misconduct for which he was disbarred, the circumstances attending his offense, his previous and subsequent conduct, and his present attitude toward the court, are important considerations; but the ultimate and decisive question is whether the application is of good moral character and is a fit and proper person to be intrusted with the privileges of the office of an attorney; in brief, whether the granting of his application would probably promote the administration of justice. This question has a broader significance than its purely personal aspect, and to persuade the court to reinstate an attorney, it must appear that his reinstatement will not be incompatible with the proper respect of the court for itself, and a proper regard for the dignity of the profession. A disbarred attorney seeking reinstatement must, like a candidate for admission to the bar, satisfy the court that he is a person of good moral character, and he has this burden whether or not opposition is made to his application. The mere formal proof of good character required upon an ordinary application of admisison to the bar is not sufficient. The proof must

be persuasive enough to overcome the court's former adverse judgment on the applicant's character."

The records of this court show that on the 10th day of October, 1908, the said George W. Egan was disbarred from practice of the law by the order and judgment of this court upon the charge of having fraudulently procured a client, Julia Ann O'Grady, to convey to him propery the value of which was in the neighborhood of $10,000, and in rendering decision this court, speaking through the late Justice Corson, said:

"The conduct of the accused in this case * * * shows that his perception of the duties and responsibilities of an attorney are such as to render him an undesirable associate of the members of a highly honorable profession, and dangerous for clients who may seek his assistance as an attorney. While we cannot overlook the fact that striking the name of the accused from the roll and revoking his license may result in serious consequences to himself and family, we cannot be unmindful of the duty we owe to ourselves, the courts of the state, the members of the bar, and the community in general. Such conduct as has been shown in this case reflects, not only upon the attorney himself, but seriously reflects upon the court and the members of the bar. All of the considerations that could be advanced in favor of the accused were ably presented by eminent counsel, but we have failed to discover any extenuating circumstances attending this remarkable transaction. To permit the accused to longer remain an officer of the court and entitled to the privileges accorded to an attorney would be to lower the standard of professional conduct, and encourage the younger members of the bar to pursue a course that cannot be recognized by this court. It has been the aim of this court to elevate the character both morally and intectually of the members of the bar, and to retain the accused longer as a member of the bar would be doing an injustice to ourselves, to the profession, and to the community. Unpleasant, therefore, as is the duty, we must perform it, and strike from the roll of this court the name of the accused, and cancel the license heretofore isued to him." 22 S. D. 355, 117 N. W. 874.

On the 3d day of November, 1908, George W. Egan was elected state's attorney for Minnehaha county. Immediately thereafter one George J. Danforth, also a candidate for said of-

fice, contested the said election of Egan on the ground that Egan, having been disbarred, was not qualified to hold said office. The contest action was tried before Hon. Joseph W. Jones, judge of the circuit court, and a decision rendered adverse to Egan. Egan thereafter appealed from the decision of the circuit court to this court, and on the 10th day of February, 1909, the decision of the circuit court was affirmed, Justice Whiting, present senior member of this court, writing the opinion. Immediately after the adverse decisions against him in the contest action, Mr. Egan, the accused, indulged in villanious abuse of the judges of the court who participated in such decisions, in the editorial columns of a newspaper of which Egan was then the proprietor and publisher. On June 22, 1909, there having in the meantime been an addition to the personnel of this court by two members, Mr. Egan filed a petition to be reinstated and to be admitted to practice law. On December 1, 1909, the said application was denied in an opinion of the court speaking through Justice Whiting. 24 S. D. 301, 123 N. W. 478. In the record of the last-mentioned proceeding will be found many excerpts from editorials and reference to cartoons contained in said newspaper published by Mr. Egan in which he referred to the late Justice Corson and Justice Haney as "political tools" and "corrupt judges." In December, 1910, he again moved the court for the vacation or modification of the judgment of disbarment then existing against him; his petition therefor, among other things, reciting:

"That he has no means for procuring a livelihood; that he is now aware that he has not by his conduct toward the judiciary of this state at all times recognized his duty as a member of the profession; that he has been hasty, inconsiderate, and unfair he admits; nor does he undertake to excuse himself or justify his shortcomings by resort to recrimination against any tribunal or individual; that he was blinded as to his plain duty to uphold the courts of this state he can now see; that for all he has done and all he has said and all he has printed which might be construed as reflecting upon this court or any individual member of it he apologizes, and in so doing he knows that he honors himself; that in the use of the term 'apologizes' he means it in the broadest sense; that he intends thereby to and does retract each and

30—Vol. 38, S. D.

every statement and charge that he has made derogatory to the court, individually and collectively, whether the same was such as to imply partiality, bias, corruption, incompetency, or to hold any member thereof, or the court as a whole, up to ridicule or contempt, by direct utterances, insinuations, or innuendoes, and, believing that this court will give credence to his apology, and will consider that sufficient punishment has been endured, and amends made for errors committed and discourtesies shown the courts of this state, he asks that this petition be filed."

On the 28th day of December, 1910, this court modified its former judgment of disbarment so as to operate as a suspension from practice until the 1st day of January, 1911. The opinion of this court on such petition, speaking through Justice Haney, said:

"Undoubtedly the petitioner has suffered; so have those whom he has brutally attacked in his newspaper and public addresses. Undoubtedly he has disregarded his duty as an attorney and counselor at law; his duty as a citizen. Nevertheless, assuming the good faith of his present attitude, appreciating the consequences to him of continued exclusion from his chosen profession, possessing the power to correct the mistake if time shall reveal that one has been made, and hoping the exercise of clemency may broaden the petitioner's charity toward his fellowmen, the court concludes, without receding in the slightest degree from either of its former decisions as to the fitness of the petitioner to practice law when such decision was rendered that he should now be given an opportunity to demonstrate the genuineness of his reformation." 27 S. D. 16, 129 N. W. 365.

With many misgivings, but still with the hope that the petitioner had been reformed and would therafter live up to the proper standard of legal ethics, the foregoing opinion was unanimously concurred in by the then membership of this court. Those who are still members of the court, however, have lived to discover that they were mistaken and deceived by such protestations of reformation on the part of Mr. Egan; that, instead of having reformed, he still persists, even to a more flagrant degree, in the same general unprofessional, fraudulent, and corrupt practices.

In May, 1915, complaint was filed in this court again charg-
ing Mr. Egan with fraudulent and corrupt practices as an attorney
in connection with some nine different charges of unprofessional
conduct. The questions of fact were referred to three referees,
attorneys of high moral standing, well known throughout the
state, and who, after a trial lasting several weeks, filed their
report to the effect that the conduct of the accused, as shown by
the evidence, was unprofessional, dishonest, and fraudulent in
relation to the Kickland charge. The testimony in relation to
this charge disclosed that one Kickland, an aged man, had em-
ployed the accused to obtain for him a bequest of property in the
state of Ohio; that Kickland and accused had entered into a
contract whereby accused was to receive one-third of the value of
the bequest of Kickland as compensation for his services as
attorney. At the time of entering into this contract the accused
knew that Kickland would receive between $6,000 and $10,000
out of an estate; that said will would be probated and fully looked
after by the executor named in the will; that the expense of pro-
bating said estate and attorneys' fees would be paid from the
residuary estate of the decedent, and that there was no occasion
for the employment of an attorney other than those employed by
the executor, and that all the services that could be performed
by Egan, if any, in looking after the interest of said Kickland,
would be nominal; that these facts were unknown to Kickland.
Egan went to Ohio on the pretext of looking after the interest
of Kickland, and on his return reported to him that there would
be a contest of the will, but Mr. Egan then knew that such
contest could not be sustained, which fact was unknown to Kick-
land, and which fact was not disclosed by Egan to Kickland;
that under such circumstances the said Egan induced said Kick-
land to execute and deliver to him a warranty deed and bill of
sale of all the interest of said Kickland in and to said estate for
the sum of $3,000, and which property was then and there well
known to Egan to be worth and of the value of more than
$8,000. The referees further found that the conduct of Egan
as shown by the evidence in relation to the Hatland charge was
unprofessional and dishonest. The facts in regard to this charge,
in substance, were that Hatland was an insane person, mentally
incompetent; that Egan, having every reason to know the con-

dition of Mr. Hatland, secured property and money to the amount of $1,250 in relation to supposed actions and circumstances which never existed in fact. The referees further found that the conduct of the accused as shown by the evidence in relation to the Renner charge was unprofessional and dishonest, the evidence in relation to this charge showing that the accused was employed as an attorney by Renner to defend a divorce action; that the accused secured from Renner some $4,000 on the false pretext of obtaining evidence to be used on the trial of the divorce action. The referees also found that the conduct of the accused as shown by the evidence relating to the Perreault charge was dishonest, unprofessional, and fraudulent, The testimony in relation to such charge tending to show that Mr. Egan entered into a contract with Perreault whereby he was to receive a contingent fee of one-half the judgment obtained in a personal injury case in which Perreault was plaintiff; that plaintiff recovered a judgment of $2,219.55, all of which sum was retained by Mr. Egan excepting $631.15, the accused wrongfully and fraudulently retaining $380.70 of said judgment belonging to said Perreault. We have carefully examined the transcript of the evidence taken on the trial before said referees, and are of the view that the referees were very, very lenient and liberal towards Mr. Egan in their findings, and gave the accused the benefit of every reasonable doubt upon the testimony. On the 4th day of April, 1916, judgment of disbarment was entered upon the said report and findings of said referees (37 S. D. 159, 157 N. W. 310), which is the judgment the petitioner now seeks to have canceled and vacated. Immediately after the filing and service of the petition in this disbarment suit the accused sent telegrams and letters to the presiding justice of this court, and also published, as advertisements in newspapers, that the said disbarment procedure was instituted by unscrupulous politicians for the purpose of injuring him in his candidacy for Governor of this state. The transcript of the testimony fails to reveal any such motive. Mr. Kickland was a farmer, Hatland was a carpenter, Renner a farmer, and Perreault a laborer. There is absolutely not a scintilla of evidence in the record tending in any degree whatsoever to show that they or either of them, in the remotest degree, had any connection with any political action adverse to Mr. Egan or even

knew, at that time, that Mr. Egan was a prospective candidate for Governor. It also appears from the record in the disbarment suit, and also from oral arguments, that the accused lost no opportunity to abuse and malign the Attorney General of this state during the prosecution of the disbarment proceedings. Under the statute law of this state it is made the duty of the Attorney General to prosecute disbarment proceedings upon the filing of sworn charges against an attorney. So far as has come to the notice of this court, the Attorney General has honestly and conscientiously and without fear or favor performed his duties in connection with said disbarment procedure.

There is no showing that the petitioner has made restitution to Kickland, Hatland, Renner, or Perreault of the sums fraudulently and dishonestly obtained from them, or that he has in any manner ever attempted to undo or to make right the wrongs he perpetrated against them, as found by the referees. On the other hand, the records of this court show that there is now pending in this court an action wherein the petitioner is appellant, and in which action the guardian of Hatland is endeavoring to recover from petitioner the sum of money which was found, by the referees, to have been dishonestly and fraudulently obtained from Hatland. There is not before this court now even a hint, or a promise, or the slightest intimation on the part of petitioner that he in the future will change his course of professional conduct from that of the past, and we are of the view, judging from past experiences, and all the records heretofore mentioned, that he has no intention of so doing.

[1] As will be observed, the certificates signed by members of the bar and business men, heretofore mentioned, state that:

"We are advised and understand that George W. Egan is desirous of making his permanent residence in the city of Chicago, with a view of practicing law in the state of Illinois."

This prominent statement in these certificates savors somewhat of a contract or understanding, that the signers thereof signed the same with the understanding that Mr. Egan would permanently leave the state of South Dakota; in other words, it can be reasonably inferred from these certificates that, in the opinion of the signers thereof, Mr. Egan would be a qualified and a fit person to practice law in the state of Illinois. His quali-

fication and fitness to practice law in the state of Illinois is a matter of no concern whatever to this court. That is a matter solely to be considered by the courts of Illinois should they ever be called upon to determine that question. The only matter before this court is his qualification and fitness to practice law in this state, and it would be a matter of unquestionable impropriety for this court to reinstate Mr. Egan solely on the ground that he intended permanently to leave this state. The fact that Mr. Egan intended to permanently leave the state of South Dakota, as evidenced by the statements contained in these certificates, no doubt furnished the incentive that prompted the signers thereof to sign the same.

[2, 3] In a proceeding to reinstate an attorney, the showing must be persuasive enough to overcome the court's former adverse judgment on the appellant's character. Thornton on Attorneys, vol. 2, p. 1335. In this reinstatement proceedings there is absolutely no showing whatever indicating or tending to prove that the court was wrong in its conclusion as to the character of the applicant in the order and judgment entered on April 4, 1916. Neither is there any showing, by way of newly discovered evidence or otherwise, that there was any mistake or any error in the findings of the referees upon which said judgment of disbarment was based. Neither is there any showing of any kind or character that the petitioner since said judgment of disbarment has in the slightest degree reformed. In the case In re Thatcher, 83 Ohio St. 246, 93 N. E. 895, Ann. Cas. 1912A, 810, a reinstatement case involving a disbarment on grounds very similar to those here presented, a case where the accused had been guilty of fraudulently and dishonestly obtaining money from his clients under very similar circumstances, a case where the accused had on the street corners and in public speeches maligned the judges of the court as "political judges," and, when brought to account for so doing, had impugned the integrity of the court in the appointment of the commissioners who tried the facts, the Supreme Court of Ohio said:

"What questions does this motion require us to determine? Certainly not the question suggested by its concluding paragraph. So often and so clearly have courts pointed out that in proceedings of this character the punishment of the offending lawyer is

neither involved nor considered that repetition is not necessary. It would perhaps be unavailing to prevent appeals for sympathy upon that ground in future cases. The respondent and all who give attention to this inquiry must be fully aware that during the entire term of his disbarment he has been in the full and uninterrupted enjoyment of all the inherent rights of citizenship. Nor can there be presented for determination here any theological question respecting the remission of sin or the facility with which it may be achieved. The general question now presented has been presented twice already. It was presented when the respondent was admitted to the bar and again when the order of his disbarment was entered. That general question is: Will the public interest in the orderly and impartial administration of justice be conserved by his participation therein in the capacity of an attorney and counselor at law? In a few jurisdictions the requirement of learning in the members of the bar is remitted, but wherever there is civilization one is required to have such character as is believed to warrant the expectation that his own interests will be held subordinate to those of his clients and of the public, that neither his zeal for victory nor his love of gain will compensate him for wrong to an adversary or for a deception practiced upon the court or for any perversion of justice, and that he will in all respects aid judges in meeting the authorized expectation that they will 'administer justice without respect to persons and without fear or favor.' When the respondent was admitted to the bar he was believed to be of that character. When it appeared that he was not he was removed. Is there good reason to believe that since the order of his disbarment was made, 18 months ago, there have gone on in his character such reforming and regenerating processes as should restore the confidence upon which he was originally admitted? The question calls for attention to the character of his offenses, though it does not require that they be again stated in detail. * * * He scandalized the administration of justice by appealing from judgments rendered in the orderly course of procedure to crowds summoned by blare of trumpet to street corners and vacant lots where by false speeches, pamphlets, and cartoons he heaped contempt and ridicule upon judicial proceedings which were conducted with fairness and propriety, and which were perhaps even

free from error. * * * Character building does not appear to be an instantaneous process, and conduct thus briefly outlined came as the fruition of more than 20 years of the professional life he lived. Common observation forbids the assumption that virtues develop more rapidly than vices. It was observation upon persistency in wrongdoing by those who are accustomed to it that suggested to the prophet the unchangeable colors of the leopard's spots. * * * Finding no reason to believe that the public interests will be conserved by the respondent's participation in the administration of justice, we overrule his motion."

We do not doubt the correctness of the views expressed by this Ohio decision.

[4] If this country is to be governed by law, it is essential that those who are charged with official duties, under the law, should discharge such duties honestly and in good faith to the best of their ability. Each one of the judges of this court has taken an oath that he will faithfully and impartially to the best of his knowledge and ability perform all the duties of his office. It is our duty to condemn conduct which tends to impair or defeat the administration of justice or degrade and impair the usefulness of the legal profession. It is our duty to protect the state and the public from lawyers who prostitute the authority given them for their own personal gain by imposing on or defrauding their clients; who impose upon the tribunals which are instituted to administer the law; and who fail to protect the rights and interests of those committed to their care.

[3] Upon the showing and record before us, we, and each of us, are of the view that we would be wholly remiss in our duties, as public officials of this state, were we to again reinstate Mr. Egan as an attorney at law.

The application for reinstatement is denied.