In re EGAN.

(218 N. W. 1.)

(File No. 6671.   Opinion filed February 17, 1928.)

George W. Egan, of Sioux Falls, pro se.

CAMPBELL, J. George W. Egan, of Sioux Falls, S. D., formerly and at two different periods (from November 15, 1907, to October 10, 1908, and from January 1, 1911, to April 4, 1916) admitted to practice as an attorney in the courts of this state, but now disbarred, has presented to this court his petition wherein he

prays the entry of an order admitting and reinstating him to practice as an attorney and counselor in this state.

Before passing to a detailed consideration of this petition and of the record of the applicant, it is perhaps fitting that we should first advert somewhat to the general legal principles involved, which must govern and control the sound judicial discretion of this court in passing upon an application of this nature.

Of these propositions doubtless the most fundamental is that what by common usage we denominate "the right to practice law" is not in any proper sense of the word a "right" at all, but rather a matter of license and high privilege. Certainly, it is in no sense an absolute right. It is in the nature of a franchise to the enjoyment of which no one is admitted as a matter of right, but only upon proof of fitness and qualifications which must be maintained if the privilege is to continue in enjoyment.

"An attorney at law is an officer of court, exercising a privilege or franchise, to the enjoyment of which he has been admitted, not as a matter of right, but upon proof of fitness through evidence of his possession of satisfactory legal attainments and fair private character. Fairfield County Bar v. Taylor, 60 Conn. 11, 15, 22 A. 441 [13 L. R. A. 767]; Ex parte Garland, 4 Wall. 333, 378 [18 L. Ed. 366]; Butchers' Union Slaughterhouse, etc., Co. v. Crescent City Live Stock Landing, etc., Co. 111 U. S. 746, 763, 4 S. Ct. 652 [28 L. Ed. 585]. For the manner in which this privilege or franchise is exercised he is continually accountable to the court, and it may at any time be declared forfeited for such misconduct, whether professional or nonprofessional, as shows him to be an unfit or unsafe person to enjoy the privilege conferred upon him and to manage the business of others in the capacity of an attorney. Ex parte Wall, 107 U. S. 265, 273, 304, 2 S. Ct. 569 [27 L. Ed. 552]; Ex parte Garland, 4 Wall. 333, 378 [18 L. Ed. 366]; Ex parte Robinson, 19 Wall. 505, 512, 22 L. Ed. 205; Ex parte Brounsall, 2 Cowp. 829." In re Durant, 80 Conn. 140, 67 A. 497, 10 Ann. Cas. 539.

"Early in the case the court found itself at variance with the respondent and his counsel touching the nature of the office of attorney at this bar and of the proceedings in disbarment. We wholly disagree with respondent that the right to practice law is a property right, to be treated with all the incidents peculiar to

property. On the other hand, we hold that it is merely an extraordinary privilege, valuable to the holder, it is true, and granted to him for life on certain conditions, upon the reasonable maintenance of which by him depends his continuance in office." In re Thatcher (C. C. & D. C.) 190 F. 969.

■ A second fundamental proposition which is too frequently overlooked, not only by laymen but by lawyers, is that the purpose of suspending or disbarring an attorney is not to punish him, but to guard the administration of justice and protect the courts, the profession, and the public.

"The proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministrations of persons unfit to practice in them. Undoubtedly, the power is one that ought always to be exercised with great caution; and ought never to be exercised except in clear cases of misconduct, which affect the standing and character of the party as an attorney. But when such a case is shown to exist, the courts ought not to hesitate, from sympathy for the individual, to protect themselves from scandal and contempt, and the public from prejudice, by removing grossly improper persons from participation in the administration of the laws." Ex parte Wall., 107 U. S. 265, 2 S. Ct. 569, 27 L. Ed. 552.

"When an attorney, one of its officers, is charged with unprofessional conduct and the court institutes inquiry in regard to the truth of the charge or charges, it is not mainly for the purpose of punishing him, but to ascertain whether he has violated the trust reposed in him. If the charges are found established, and show such misconduct in his office as amounts to a violation of his trust, it then becomes the duty of the court to remove him from the office of an attorney, not primarily as a punishment to him, but as a protection to the court and community." In re Enright, 69 Vt. 317, 37 A. 1046.

"So often and so clearly have courts pointed out that in proceedings of this character the punishment of the offending lawyer is neither involved nor considered that repetition is not necessary. It would perhaps be unavailing to prevent appeals for sympathy upon that ground in future cases." In re Thatcher, 83 Ohio St. 246, 93 N. E. 895, Ann. Cas. 1912A, 810.

"This is not a proceeding by way of punishment, though the

deprivation of the privileges of an attorney may be a matter of serious importance to a practitioner. It is a measure necessary to the protection of the public, who have a right to expect that courts will be vigilant in withholding, and, if already given, withdrawing, their certificates of qualification and character, upon which the public rely. Attorneys are officers in a sense; they must possess such qualifications as the law prescribes, sanctioned by the certificate of the courts, or they may not enjoy the privileges of the office. As said by Mr. Justice Whipple, in Re Mills, 1 Mich. 395.:

" 'Should this court, after being officially advised that one of its officers has forfeited the good name he possessed when permitted to assume the duties of his office, still hold him out to the world as worthy of confidence, they would, in my opinion, fail in the performance of a duty cast upon them by the law. It is a duty they owe to themselves, to the bar, and the public, to see that a power which may be wielded for good or for evil is not intrusted to incompetent or dishonest hands. The extreme judgment of expulsion is not intended as a punishment inflicted upon the individual, but as a measure necessary to the protection of the public, who have a right to demand of us that no person shall be permitted to aid in the administration of justice whose character is tainted with corruption.' " In re Shepard, 109 Mich. 631, 67 N. W. 971.

"In one or two of the affidavits in the record the statement is made that the petitioner has been punished enough, as if a disbarment were punitive in character. It is not. The removal of an attorney's name from the rolls of the profession is a measure protective in character; in a certain sense protective of the profession, but in a higher sense protective of the public which finds it necessary to resort to the services of lawyers. No one not a lawyer can fully realize the opportunities for undiscovered peculation, graft, and embezzlement which are afforded the practitioner at the bar. No one not a lawyer can so well understand the degree to which the public is entitled to protection from dishonesty in the profession. When a member of the profession has been found lacking in the requisites which go to make him a helper to his clients and has been discovered to possess aims, views, and purposes which indicate a moral obliquity in him, and which might make his clients his victims, it is well that he were removed from the possibility of doing them harm. When he has been once disbarred, a mistaken

charity should not restore him to his position. That restoration should only come when he has lived long enough after his disbarment in honorable intercourse with his fellow citizens to demonstrate that he is both tried and true." In re Shepard, 35 Cal. App. 492, 170 P. 442.

"Much was said in the testimony of witnesses in the applicant's behalf before the superior court and in argument here to the general effect that the applicant had been sufficiently punished for the offense for which he was suspended. That view of the case entirely misconceives the question before the court for decision. Disbarment and suspension from practice are not visited upon offending practitioners as a means or measure of punishment. They are steps taken by the court, whose officer the attorney is, for its own protection and that of the public from the misconduct of untrustworthy men in the exercise of functions of great and intimate concern to both." In re Durant, 80 Conn. 140, 149, 67 A. 497, 10 Ann. Cas. 539.

"For like reason, the question for determination on an application like this is not one as to the sufficiency of the punishment already suffered by the offending attorney, but one as to the present fitness of the applicant for reinstatement to again exercise the privileges and functions of an attorney as an officer of the court and confidential manager of the affairs and business of others intrusted to his care and keeping in view his previous misconduct, his discipline therefor, and any reformation of character wrought thereby or otherwise as shown by his more recent life and conduct." In re Kone, 90 Conn. 440, 97 A. 307.

"Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them. Compliance with that condition is essential at the moment of admission; but it is equally essential afterwards. Selling v. Radford, 243 U. S. 46, 37 S. Ct. 377, 61 L. Ed. 585; Matter of Durant, 80 Conn. 140, 147, 67 A. 497, 10 Ann Cas. 539. Whenever the condition is broken the privilege is lost. To refuse admission to an unworthy applicant is not to punish him for past offenses. The examination into character, like the examination into learning, is merely a test of fitness. To strike the unworthy lawyer from the roll is not to add to the pains and penalties of crime. The examination into character is renewed; and the test of fitness is no

longer satisfied. For these reasons courts have repeatedly said that disbarment is not punishment. Ex parte Wall, 107 U. S. 265, 2 S. Ct. 569, 27 L. Ed. 552; Matter of Randall, 11 Allen (Mass.) 473, 480; Matter of Randel, 158 N. Y. 216, 52 N. E. 1106; Boston Bar Ass'n v. Casey, 211 Mass. 187, 192, 97 N. E. 751, 39 L. R. A. (N. S.) 116, Ann. Cas. 1913A, 1226; Matter of Durant, supra.

"'The question is,' said Lord Mansfield, 'whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion.' Ex parte Brounshall, [2] Cowp. 829. 'It is not,' he continued, 'by way of punishment; but the court, on such cases, exercise their discretion whether a man whom they have formerly admitted is a proper person to be continued on the roll or not.'" In re Rouss, 221 N. Y. 81, 116 N. E. 782.

"A certificate of admission to the bar is a pilot's license which authorizes its possessor to assume full control of the important affairs of others and to guide and safeguard them when, without such assistance, they would be helpless. Moreover, in Idaho, it is a representation made by this court that he is worthy of the unlimited confidence which clients repose in their attorneys; trustworthy to an extent that only lawyers are trusted, and fit and qualified to discharge the duties which devolve upon members of his profession.

"The purpose of disbarment is not the punishment of the attorney; it is to protect the public and those charged with the administration of justice from the misconduct of persons who have found their way into the legal profession and who are unfit to perform the duties of an attorney at law." Re Kerl, 32 Idaho, 737, 188 P. 40, 8 A. L. R. 1259.

█ Under these fundamental principles we must necessarily subsume that the question presented to this court by the application of a disbarred attorney for reinstatement is, in final analysis, not whether the applicant has been sufficiently punished for prior misconduct, but whether he is at the time of his application of such fair character as to justify his admission to practice.

█ █ The question may conceivably be presented in two ways. An applicant may take the position that at all times since his original admission to the bar he has been of such fair character and conduct as warranted the continuance of his license to

practice, and that the court erred in disbarring him. On the other hand, an applicant may tacitly or expressly admit the propriety of the judgment of disbarment, express contrition for his improper conduct resulting in disbarment, and advance the view that, notwithstanding such former misconduct, the impropriety of which he realizes and regrets, he has subsequently undergone such change of heart as to reincarnate the good moral character he presumptively had at the time of his admission; that he will not again offend and, in spite of past mistakes, is now a fit and suitable person to be readmitted to the privilege which he once enjoyed and lost by his own misconduct. It is this second position of admission of misconduct, contrition, and reformation which the present applicant now seeks to occupy, as will more fully hereinafter appear from his petition, and it therefore becomes necessary to take into consideration his former record together with his conduct subsequent to his disbarments. His present petition really amounts to an application for admission to the bar without the benefit of the presumptions as to character which normally attend upon a first application.

"Proceedings of this nature are generally styled proceedings for reinstatement, but they are only popularly so called, for it has been determined that they are really but applications for admission to the bar, and cannot in strictness be treated as applications to vacate the order of disbarment. In re Mash [39 Cal. App. 548, 179 P. 897] supra; Danford v. Superior Court, 49 Cal. App. 303 (193 P. 272). We therefore must consider the present petition as if it were an application for admission by one who came to us from a sister state with the record as a lawyer there similar to the record which petitioner established when he was a member of the bar here." In re Cate, 60 Cal. App. 279, 212 P. 694.

■ ■ We conceive it to be our duty to put aside, so far as possible, that natural feeling of sympathy for one who has manifestly suffered, and to determine in so far as we can from the entire record, without fear, favor, or partiality, the question, and the sole question, presented for our judicial determination, namely, the present fitness of the petitioner to be admitted to practice law, having, to quote the words of the petitioner addressed to this court on September 1, 1909, "no purpose or object except to deal fairly between [him] on the one hand and the people on the other." And

in the making of such determination the matters proper to be considered and the method of procedure are perhaps no better stated in the books that in the language of Whiting, J., in the matter of Re Morrison, 45 S. D. 123, 186 N. W. 556, wherein he said:

"When an applicant seeks admission to the bar, and the court or other examining body is called upon to determine his moral fitness for the high position to which he aspires, he is entitled to the benefit of the presumption that he is morally fitted for such position; and but little evidence is required in support of such presumption. When, after having been so admitted, it is charged that he is unfit to continue to exercise the power vested in him as an attorney, the court should guard his every right and see to it that he be not deprived of an opportunity to follow his chosen profession—in preparation for which he may have given years of effort—except upon clear proof of more than trivial abuses of the confidence that has been reposed in him. But when, after full and fair trial, he stands convicted of such wrongdoing as demonstrates his unfitness to act as an officer in courts of justice, and his license as such has been revoked, if he petitions for reinstatement, the burden is upon him to establish by satisfactory evidence, either that the court erred in its judgment of disbarment, or that he has undergone such moral change as to render him a fit person to enjoy the trust and confidence once forfeited. A court should be slow to disbar, but it should be even slower to reinstate; it should endeavor to make certain that it does not again put into the hands of an unworthy petitioner that almost unlimited opportunity to inflict wrongs upon society possessed by a practicing lawyer. It therefore becomes the duty of the court, upon a petition for reinstatement of one who has been disbarred, to seek, not merely through hearings in court, but through every legitimate channel open to it, such information as it may obtain touching upon the then moral fitness of the petitioner to be admitted to practice his chosen profession."

At this point it is, we think, advisable to set out in full the present petition of the applicant. It is signed and verified by the applicant, and reads as follows:

"To the Honorable, the Supreme Court of the State of South Dakota:

"Applicant states:

"Paragraph I. That on the 4th day of April, 1916, he was disbarred from practicing his profession as an attorney and counselor in this state, by an order entered by this court of that date.

"Paragraph II. That from said date to the present time applicant has respected the order of the court, both in letter and in spirit.

"Paragraph III. That all the time since his disbarment, applicant has continued to reside in the state of South Dakota, with his home in the city of Sioux Falls. He has worked at whatever he could do to provide for his family. He owned and published newspapers. He has engaged in public speaking. He has been in the real estate and investment business, and has done the best he could under the limitations placed upon him by disbarment. All the time during these years applicant has been a thorough student of books and of things and has sought to improve his mind and general education by a careful study and analysis of good books, and has taken several courses of study requiring profound thought and deep research.

"Paragraph IV. That applicant now applies to this honorable court asking to be reinstated as an attorney and counselor at law, and respectfully shows:

"(a) That this court by its decision has stated the manner in which a lawyer, having been disbarred, may present his petition and make his showing in support thereof for reinstatement. Applicant has complied with the rule of the court to the very best of his ability.

"(b) That a petition by lawyers, addressed to this court, was signed by over two hundred members of the bar of Minnehaha county and in other parts of the state where applicant is best known, asking this honorable court to reinstate applicant.

"(c) That applicant calls the attention of the court to this petition and particularly to the signatures on it of ex-members of this court, to wit: Mr. Justice Haney, of Huron; Mr. Justice McCoy, of Huron; and Mr. Justice Smith, of Vermillion, and to many other leading lawyers of the state who have affixed their names and make their requests that applicant be reinstated.

"(d) That applicant calls attention to the fact that the surviving members of the commission who heard the testimony against

him in the disbarment proceedings, to wit, Hon. A. H. Orvis, of Yankton, and Hon. Chambers Kellar, of Lead, also petition that applicant be reinstated.

"Paragraph V.  That said petition thus prepared and thus signed is presented by applicant, with his petition, embodied herein and made a part hereof, with the hope that it may be considered in the light and under the rule heretofore laid down by the court governing the recommendation by lawyers of an applicant for reinstatement.

"Paragraph VI.  That in said decision heretofore referred to, the court stated in substance that it is necessary for a disbarred attorney, on seeking readmission to the bar, to present to the court evidence of good standing as a citizen in the community where he is best known.  Acting under the spirit of that decision and seeking to comply with the rule therein announced, applicant respectfully calls the attention of the court to the fact:  That a general primary election was held in the city of Sioux Falls, on the 28th day of March, 1922, 6 years after applicant had been disbarred, for the purpose of choosing a Republican candidate for Governor of the state of South Dakota.  The candidates at said primary election were the then Governor, Hon. W. H. McMaster, and this applicant, George W. Egan.  That the official count of the votes received by each candidate at said primary election at said time and place, was as follows:  Hon. W. H. McMaster, 4,359 votes; George W. Egan, 5,002 votes.

"Paragraph VII.  That on the 15th day of April, 1924, 8 years after applicant had been disbarred, at a general election held in the city of Sioux Falls for the purpose of choosing a mayor of said city, the candidates at said election were:  Hon. George W. Burnside, Hon. Thomas McKinnon, and applicant, George W. Egan.  That said candidates received the following number of votes:  George W. Burnside, 2,407 votes; Thomas McKinnon, 3,564 votes; George W. Egan, 5,588 votes.

"Paragraph VIII.  That in order to more fully establish before the court the standing of applicant at this time in the city in which he has resided since his disbarment, and tending to prove the good will, esteem, and respect in which he is held, and for no other or different reason, applicant presents herewith, attached hereto and as a part hereof, a petition addressed to the court, signed by a

very large number of the business interests of the city of Sioux Falls. This petition represents millions of dollars in cash and investments, as well as hundreds, if not thousands, of citizens, and to a large degree is by those business interests with which applicant has had personal transactions, and to which his reputation for probity and honesty necessarily must be known. Applicant respectfully requests that this petition may be considered by the court and given the weight to which the court may deem it entitled.

"Paragraph IX. That the court will note that this petition is signed by practically every business interest in Sioux Falls, and applicant avers that in a single instance out of all to whom the petition was presented, was there a hesitancy to sign the business institution. With pardonable pride applicant asks an examination of this petition and calls attention to the fact that Hon. Thomas McKinnon, city mayor, Hon. Ellis O. Smith, city commissioner, Hon. Joseph S. Nelson, city commissioner, and Hon. George W. Burnside, ex-mayor, petition the court that applicant may be reinstated.

"Paragraph X. That applicant is fully sensible to his great obligations to that fine, generous-minded body of lawyers, to whom the petition was presented, for the whole-hearted indorsement given to him. What finer tribute in face of all the facts could be paid to applicant? Applicant fully knows and thoroughly understands his duty to these men.

"Paragraph XI. That applicant is not less mindful of the debt of gratitude, which even years of loyalty and right living may not discharge, to all those high-minded, noble-hearted business men, among whom he has lived for nearly 21 years, who come forward and petition this court that his application may prevail. Yes, applicant knows and understands all these unusual obligations that now rest upon him.

"Paragraph XII. That applicant realizes that he is getting well along in years and has reached the point in life at which one is sometimes called 'an old man.' From his present viewpoint, applicant realizes that he has made grevious mistakes; that he has committed many serious errors, and has said and done things unworthy of him and unworthy of an officer of this court, all of which applicant very sincerely regrets. He realizes that at all times he has not demeaned himself or used his energies and abilities

strictly in accordance with the rules and requirements of this court. But, even so, with his changed habit and thought of mind, he feels that he may now come to the court and, by a sincere and dignified apology for any and all wrongs and mistakes that may be charged to him, receive just and fair consideration, tempered with mercy, before this court.

"(1)   That applicant knows that this is a government of law, and not a government of men, and that in direct proportion as the law is upheld and fairly and honestly enforced, to that degree are the objects and purposes of government attained.

"(2)   That he also knows that it is charged to all good citizens and particularly to practicing attorneys, to uphold the law; to be especially solicitous that the laws are justly and impartially enforced, and the dignity and the honor of the courts respected and proclaimed.

"(3)   That applicant, now looking back upon his life, sees things from a changed and different viewpoint; he has erred; he has made many mistakes; he has suffered deeply for years; he has changed in attitude, both of heart and mind; he knows that he must follow a new path and realizes that there is not for him honors or preferments.   Applicant knows that he may only hope to provide for his family, meet his obligations, and build for them a home for the evening of life which is fast coming upon him and them.   This he can do and will do if through the order of this court he is permitted to take up the broken threads of his life's work and weave them into a degree of success that may be satisfactory to his friends and to the court.

"Wherefore, and because of the matters and things as they now exist, and as they are set out and described herein, applicant prays that the court will find it consonant with its concept of duty, tempered with charity and mercy, to at an early date enter its order admitting him to practice his profession as an attorney and counselor in this state.   And thus he will ever pray."

We turn now to a consideration of the history and conduct of the applicant, as disclosed by the records of this court, with reference to his admission to practice law in this state and his previous disbarments.

The petitioner made application to this court to be admitted to practice in the month of October, 1907.   At that time he was

approximately 36 years of age, had practiced law in the neighboring state of Iowa for some 6 years, and was a university graduate, having matriculated at one of the greatest mid-western educational institutions, and having received the degrees of Master of Arts and Master of Laws. At the time he thus applied for admission in this state his application was resisted by a committee appointed for that purpose by the Bar Association of Minnehaha county. In the face of this resistance, however, the applicant was admitted to practice, conditionally at least, and the facts with reference to this first application, the resistance thereto and the order thereon, will be found set out in the case of In re Egan, 22 S. D. 355, 117 N. W. 874, at pages 356, 357, of the state report.

Thereafter and in August, 1908, the same committee of the Minnehaha Bar Association, which had resisted the application for admission, filed in this court a verified accusation charging the applicant with improper conduct and praying the revocation of his license. Upon this accusation such proceedings were duly and regularly had, as resulted in an opinion of this court disbarring the said applicant, being the opinion last above referred to in Re Egan, 22 S. D. 355, 117 N. W. 874, filed October 10, 1908. This court at that time consisted of three members, Judge Haney, presiding, and Judges Corson and Fuller. The opinion in this case was by Corson, J., Haney, P. J., concurring. Judge Fuller was then stricken by the illness of which he died on November 11, 1908, and did not participate in the decision.

Shortly after this judgment of disbarment and about January 1, 1909, the applicant began the publication of a weekly paper in Sioux Falls in this state, christened "The American Republic" of which he himself said:

"The American Republic is absolutely owned and controlled by Mr. Egan. No other party owning any stock or interest in the paper. It was the original purpose of the editor to organize a stock company and plenty of money was forthcoming for the establishment of the paper; but upon deliberation Mr. Egan thought that by owning the paper himself he could enjoy a freer and more effective hand in the fight that he is continuing to make against the bunch of corrupt thieves and grafters, who have been harassing him ever since he came to the state."

On June 22, 1909, the applicant applied to this court for re-

instatement as a member of the bar, which application was again resisted by a committee of the Bar Association of Minnehaha county. The application for reinstatement was heard in this court on September 1, 1909, when the applicant appeared and argued the matter in person, taking the position that he had not at any time committed any wrong, that his conduct with reference to Julia Ann O'Grady was entirely fair, honest, and legitimate, and that he had been vindicated by the electors of his county at the general election on November 5, 1908, when after his disbarment he had been elected state's attorney of that county. See Danforth v. Egan, 23 S. D. 43, 119 N. W. 1021, 139 Am. St. Rep. 1030, 20 Ann. Cas. 418. He had no apology to make, sought to justify his every act, and with reference to his disbarment stated in an address to the court:

"I specifically deny each and every allegation contained in the charge, and I allege that I am in a position to prove to any reasonable minded man that the accomplishment of my disbarment, based on the said charge, was the most wicked and damnable conspiracy that has been executed since Michael Cervetus was burned at the stake and Beelzebub conspired against the laws of God."

In that proceeding there were offered in evidence the files of applicant's newspaper from its first issue, being volume I, No. I, on January 1, 1909, down to the date of the hearing. An examination of that file now shows that his paper fairly bristled with vilification of judges and attacks upon this and other courts. Issue after issue of that paper contains matter written by applicant, or for which he is responsible, which would amply justify the disbarment of any attorney who might write and publish the same. A few of those matters are set out in the opinion denying the application for reinstatement which will be found under the title of In re Egan, 24 S. D. 301, 123 N. W. 478, filed December 1, 1909. It should be noted that the judges of this court had now been increased from three to five. There were now on the court only two members who had been such at the time of applicant's first disbarment, October 10, 1908, being Haney, P. J., and Corson, J., neither of whom participated in the matter of denying reinstatement; but opinions were written therein by Whiting, J., and McCoy, J., both concurred in by Smith, J., to which opinions we refer.

Thereafter and on July 26, 1910, the applicant made a second application for reinstatement which was heard on September 21, 1910, and an opinion of this court was written and filed December 28, 1910, modifying the original order of disbarment of October 10, 1908, so as to operate as a judgment of suspension expiring January 1, 1911. The opinion in this case will be found under the title of In re Egan, 27 S. D. 16, 129 N. W. 365. It is worthy of note that this opinion, which in effect reinstated the applicant, was written by Haney, J., who had been cartooned, vilified, and insulted by the applicant in the columns of his paper for nearly a year, in a manner fortunately without parallel in this state. Some idea of the abuse which applicant, without any justification or excuse, had heaped upon Judge Haney and others may be gained from the excerpts set out in the opinion Re Egan, 24 S. D. 301, 123 N. W. 478, previously referred to. The full scope and extent of such attacks can only be realized from an examination of the files of applicant's newspaper during the year 1909.

In making this second application for reinstatement applicant for the first time appeared to recognize that he might conceivably have been gulity of some improprieties. He apologized and retracted in the broadest sense, for which he deserves credit. His second petition for reinstatement, including his apology and retraction, will be found in Re Egan, 27 S. D. 16, 129 N. W. 365, at pages 17 and 18 of the state report. At this hearing also applicant appeared in person, and in the course of his remarks to the court he amplified his apology and retractions, and he said in part:

"Now, your honors know that in the disbarment cases where a man has been a member of the bar and where it means so much to him to take his profession, why there is not a lawyer, your honor, that has had any success, but would agree with what Judge Church of Dennison, Iowa, said, 'A man would rather lose his life than lose his profession,' and in all these cases there has been a disposition to give a man a chance—to give a man a chance to come back—and that's what I want. I am not here for any other purpose; I wouldn't ask the time of the court—I have been to this court, this makes the third time—if I didn't want to go back to practice law, and I want to assure the members of this court, individually and collectively, that if you give me the right to prac-

tice law, you will have no reason to regret it. I would be willing to enter this of record: That if this court grants me the right to practice law, and anything comes to its attention, not from my political enemies, but from a reliable source, and any member of this court will write me and say that I have, in his judgment, violated my obligations as a lawyer and my promise to him, I will come in and surrender my license."

This second application for reinstatement was likewise resisted by the Minnehaha County Bar Association, which had opposed the original application for admission in 1907, and had filed complaint for disbarment in 1908. But notwithstanding such resistance, the reinstatement was granted by the court without a dissenting voice. In view of the previous conduct of applicant, and in view of his slanderous and outrageous attacks upon the court and members of the court in his newspaper during the period of nearly a year, surely the unanimous opinion of the court permitting his reinstatement is the best possible evidence that the court acted in all fairness, with no malice toward the applicant, and with full acceptance of his apology and retraction, and a confident reliance upon his promises as to the future. That they did so act and rely, and that they did not reinstate him because of any view that the court had formerly erred in his disbarment, is most palpably indicated by the following language from Judge Haney's opinion:

"The petitioner's testimony, the files of his newspaper, the former decisions of this court, and all its records disclose relevant to the issues presented by his petition have received the thoughtful consideration of each member of the court as now constituted. All concur in these conclusions: (1) That the court would have been justified in refusing to admit the petitioner in the first instance until after the litigation relating to the O'Grady property then pending had been concluded; (2) that the petitioner's conduct in connection with the O'Grady case clearly justified the decision revoking his license; and (3) that the petitioner's attacks upon the courts of this state clearly justified the denial of his application for reinstatement. So the only question open to discussion is whether the petitioner's conduct since his application for reinstatement was denied has been such as to justify the assumption that he has become a fit person to practice law. He was mistaken when

he testified 'that since the last opinion, I have written or said or done nothing against this or any other court in this state.' An examination of the files of his newspaper in the department of history will disclose numerous libelous articles concerning the courts and judges of this state, published since the decision denying his application for reinstatement was rendered. It will be assumed, however, that when the pending petition was filed the petitioner acted in good faith, was prompted by proper motives, and that he now honestly intends hereafter to maintain the respect due to courts of justice and judicial officers. Though now conceding that the judgment in the disbarment proceeding was the honest expression of this court, upon the evidence before it, he has not admitted there was any impropriety in his conduct towards his client, Julia Ann O'Grady. Naturally, no one usually views his own conduct as it is viewed by others. No one should renounce an honest belief, however erroneous. The petitioner should not be criticized for adhering to his belief if he honestly believes he should not have been disbarred. But he should be condemned by all fair-minded persons for his long-continued refusal to concede that others might honestly differ from him on that subject. Undoubtedly the petitioner has suffered; so have those whom he has brutally attacked in his newspaper and public addresses. Undoubtedly he has disregarded his duty as an attorney and counselor at law; his duty as a citizen. Nevertheless, assuming the good faith of his present attitude, appreciating the consequences to him of continued exclusion from his chosen profession, possessing the power to correct the mistake if time shall reveal that one has been made, and hoping the exercise of clemency may broaden the petitioner's charity towards his fellow men, the court concludes, without receding in the slightest degree from either of its former decisions as to the fitness of the petitioner to practice law when such decision was rendered, that he should now be given an opportunity to demonstrate the genuineness of his reformation." In re Egan, 27 S. D. 16, 129 N. W. 365, 367, at page 22 of the state report.

As a result of this last opinion the petitioner was readmitted to the practice of law in this state on January 1, 1911, at 12 o'clock noon. Thereafter and on May 14, 1915, one J. J. Kickland, son of Theodore Kickland, filed in this court his verified accusation against the petitioner, charging him with unprofessional conduct

and asking the revocation of his license. This complaint was referred to the Attorney General of this state for investigation as provided by statute, and as a result of such investigation a complaint was filed against the petitioner and the matter was referred to three referees, Hon. A. H. Orvis, of Yankton, S. D., Hon. Chambers Kellar, of Lead, S. D., and Hon. A. W. Campbell, late of Aberdeen, S. D. An amendment was allowed to the complaint. See In re Egan, 36 S. D. 228, 154 N. W. 521. On February 15, 1916, said referees filed in this court their findings of fact and conclusions of law whereby they found that the conduct of the petitioner was unprofessional, dishonest, and fraudulent in relation to what were denominated as the "Kickland, Hatland, Renner, and Perreault charges," and that petitioner's conduct in relation thereto demonstrated that he was a person unfit to practice as an attorney at law, and said referees recommended a judgment canceling and revoking his license to practice law in this state. The second, third, and fourth findings of fact of the referees with reference to the Kickland charge are as follows:

"(2) That on the 31st day of May, 1911, said Egan was employed by said Theodore Kickland to represent him in connection with the estate of Lafayette Kickland, deceased, then about to be probated in the probate court of the county of Cuyahoga, state of Ohio; that such employment was evidenced by a written agreement made and entered into by and between said Egan and said Theodore Kickland on said day, which agreement provided that said Egan should use his own judgment as to the manner in which he should look after the interest of said Theodore Kickland in said estate; that he should pay his own expenses in connection therewith, and should receive one-third of any sum or property that might be recovered by the said Theodore Kickland out of said estate.

"(3) That at the time of making said written agreement said Theodore Kickland also executed and delivered to said Egan a power of attorney which purported to authorize and empower said Egan to do and perform every act and thing requisite or necessary to be done in connection with the interest of said Theodore Kickland in said estate.

"(4) That at the time of making said agreement and power of attorney said Egan and said Theodore Kickland had knowledge

that Theodore Kickland was the residuary legatee named in the will of Lafayette Kickland, and that said Lafayette Kickland was dead; and said Egan had knowledge and information received by him from a firm of lawyers of Cleveland, Ohio, which he did not communicate to Theodore Kickland, that said will was in due form and would in all probability in due time be probated, that the same would be sustained by the probate court of Cuyahoga county, state of Ohio, and that said Theodore Kickland, as such residuary legatee, would receive out of said estate between $6,000 and $10,000; that said will would be probated and fully looked after by the executor therein named, and that the expense of said probate proceedings and fees of attorneys in Ohio on behalf of said estate would be paid from the residuary estate of said Lafayette Kickland, and that there was no occasion for the employment of any South Dakota attorney or any attorney other than those employed or to be employed by the executor, and that the services to be performed by said Egan, if any, in looking after the interest of said Theodore Kickland in said estate, would be nominal."

It is, we think, deserving of particular notice that the petitioner procured this fraudulent and utterly unconscionable contract from his client Kickland on May 31, 1911, exactly 5 months after he had been readmitted to practice law in this state, as hereinbefore set out, and less than 9 months after his promises and protestations before this court on September 21, 1910. As a result of this accusation, complaint, investigation, and report an opinion of this court was filed on April 4, 1916, for a second time disbarring the petitioner. This opinion will be found under the title of In re Egan, 37 S. D. 159, 157 N. W. 310, and reference is thereto made for the facts which are quite fully therein set out. It should be noted that this also was an unanimous opinion of the court, and that Judges Haney and Corson were no longer members of the court, which consisted now of Polley, P. J., and Whiting, Smith, Gates, and McCoy, Judges. And in the course of this opinion written by Whiting, J., in behalf of the three members of the court who were members at the time of petitioner's reinstatement to practice by the opinion of December 28, 1910, he said:

"The three members of this court who were then members desire to state that it was with much hesitancy, and with a feeling that its better judgment was perhaps being unduly influenced

through sympathy for the respondent, and yet prompted somewhat by the fear that , in case it refused his petition, it might do injustice, that this court, upon the second petition for readmission, determined to err, if it erred at all, on the side of mercy. While it fully realized the gravity of respondent's past offenses, it yet hoped that his protestations of reformation and regret for the past, as declared in his petition and his sworn statements in open court, were sincere, and that his future record as an attorney at law would justify its action." In re Egan, 37 S. D. 159, 157 N. W. 310, 311, at page 162 of state report.

This second disbarment is the one from the effect of which petitioner now seeks to be relieved and is the one referred to in paragraph 1 of his present petition for reinstatement. This matter was twice more before this court in relation to costs. See In re Egan, 37 S. D. 642, 159 N. W. 393; In re Egan, 38 S. D. 224, 160 N. W. 814.

Thereafter and on January 27, 1917, without any shownig of any sort in support thereof, the applicant filed in this court his application to set aside the disbarment order of April 4, 1916, which application was as follows, without more:

"Comes now, on this 2d day of January, A. D. 1917, the above-named George W. Egan and moves this honorable court for an order vacating and setting aside that certain order of disbarment made and entered in the above entitled proceeding on the 4th day of April, A. D. 1916, for the reasons that he has been severely punished and suffered great pecuniary loss because of said order and because the ends of justice will be subserved by its vacation as asked for. George W. Egan."

On the same day, January 27, 1917, said application was denied by order without opinion, which order recited in part as follows:

"And the court being of the opinion that no showing has been made that the applicant is a fit person to be admitted to the practice of law, it is ordered that said application be and it is hereby denied."

On March 10, 1917, the applicant filed in this court a second petition for reinstatement, accompanied by the petition of a considerable number of members of the bar and a considerable number of business men of the city of Sioux Falls. On March 22,

1917, this application was denied in an opinion by McCoy, J., wherein the facts are fully set out with reference to the matter and particularly with reference to the petitions or recommendations of the members of the bar and business men accompanying the application. To that opinion we now refer. It will be found under the title of In re Egan, 38 S. D. 458, 161 N. W. 1003. In that opinion Judge McCoy said (at page 469 of the State Report [161 N. W. 1005]) :

"There is no showing that the petitioner has made restitution to Kickland, Hatland, Renner, or Perreault of the sums fraudulently and dishonestly obtained from them, or that he has in any manner ever attempted to undo or to make right the wrongs he perpetrated against them, as found by the referees,"
—and it is to be noted that the applicant's present showing is equally silent with reference to this matter of restitution.

This, we think, is the history of the applicant with reference to his efforts to be and continue admitted to the practice of law in this state from October, 1907, down to the filing of his present application for reinstatement, being the third application made by him since the order disbarring him for the second time on April 4, 1916.

One of the questions most essential for our consideration upon this application is with reference to the conduct of the applicant from his second disbarment in 1916 down to this date. We have carefully re-examined the record upon which he was for a second time disbarred in 1916, and we are thoroughly persuaded that such judgment of disbarment was amply justified, and we do not see how the court could by any possibility have done otherwise. The petitioner at this time makes no claim whatever that such judgment of disbarment was in any respect erroneous or undeserved. He must be taken as admitting the soundness of the judgment of this court when it held that on April 4, 1916, he was not of such moral character as to be entitled to engage in the practice of law in this state, and by the language of paragraph XII of his petition he does substantially so admit. It is then of prime importance to consider whether by his conduct since that date he has given satisfactory and sufficient evidence of reformation and moral renovation whereby it may be held to appear that he is now of that fair moral character in which he was found lacking in 1916. The petitioner makes

no detailed showing at this time as to his conduct since 1916, and the only reference which he makes thereto is found in the language of paragraph III of his petition, which we here requote as follows:

"That all the time since his disbarment, applicant has continued to reside in the state of South Dakota, with his home in the city of Sioux Falls. He has worked at whatever he could do to provide for his family. He has owned and published newspapers. He has engaged in public speaking. He has been in the real estate and investment business, and has done the best he could under the limitations placed upon him by disbarment. All the time during these years applicant has been a thorough student of books and of things and has sought to improve his mind and general education by a careful study and anlysis of good books, and has taken several courses of study requiring profound thought and deep research."

It is nevertheless our duty, as pointed out in Re Morrison, 45 S. D. 123, 186 N. W. 556, to acquire, through all legitimate channels open to us, such information as may be available touching the present moral fitness of the applicant to be admitted to practice law. From the files and records of this court and of other courts of record, we have at least the following information concerning the petitioner and his conduct subsequent to his second disbarment:

On May 10, 1920, an information was filed against him in Minnehaha county, S. D., charging him with the offense of presenting false and fraudulent proofs in support of a claim for loss under a contract of insurance, in violation of section 4271, R. C. 1919. A trial was duly had, Hon. Frank B. Smith, one of the Judges of the Fourth Judicial Circuit, being called in to preside, and the petitioner was found guilty by a jury. His motion for new trial was denied, and he appealed to this court. The case was here reversed, and remanded for a new trial. State v. Egan, 44 S. D. 273, 183 N. W. 652.

Thereafter and on April 3, 1922, a second trial was commenced in Minnehaha county, S. D., before another jury with Hon. James McNenny, Judge of the Eighth Judicial Circuit in this state, presiding. This second jury likewise found the petitioner guilty of the offense with which he was charged, returning their verdict on April 15, 1922. Again the petitioner moved in the court below for a new trial, and again such motion was denied. Again he ap-

pealed to this court, and upon his second appeal the judgment of conviction was affirmed. See State v. Egan, 47 S. D. 1, 195 N. W. 642, Dillon, J., dissenting. On November 14, 1923, petitioner moved in this court for a rehearing in said cause, which application for rehearing was denied on November 27, 1923, the case in due course remanded, and the petitioner sentenced to a term of 2 years in the penitentiary.

Thereafter and on December 1, 1923, the petitioner procured to be issued out of the District Court of the United States for the District of South Dakota a writ of habeas corpus directed to Vincent L. Knewel, as sheriff of Minnehaha County, S. D., in whose custody the petitioner then was previous to commitment to the penitentiary for service of his sentence. Pending the hearing upon said writ the petitioner was released on bail. He sought by said writ to raise in the federal court the proposition that he had been deprived of his liberty without due process of law in infringement of his rights as a citizen of the United States, under the Fourteenth Amendment to the United States Constitution, upon the ground that the state court had no jurisdiction to try him because the county in which the offense was alleged to have been committed was not stated in the information. The United States District Court held with the petitioner on this contention, Reeves, District Judge, sitting in place of Hon. James D. Elliott, Judge of the United States District Court for the District of South Dakota. See Egan v. Knewel (D. C.) 298 F. 784.

It is to be observed that this trial in the federal court did not in any wise involve the fact question of whether or not the petitioner had committed the offense charged, but went only to the question of whether there was such fatal defect in the information, because of failure to lay the venue in Minnehaha county, as to deprive the state court absolutely of jurisdiction. From the decision of Judge Reeves last above mentioned, Buell F. Jones, Attorney General, and Byron S. Payne, of Pierre, S. D., assisting him, as attorneys for Sheriff Knewel, took an appeal to the Supreme Court of the United States. The term of Knewel as sheriff expired on January 6, 1925, at which time he was succeeded in such office by one Boardman. Just before the expiration of Knewel's term as sheriff, the petitioner procured Knewel to move for a dismissal of the appeal in the Supreme Court of the United States, appearing by other

counsel and alleging that he had never authorized either Jones or Payne to appear for him or to take the appeal, and did not desire to appeal, and later and in March, 1925, petitioner procured Knewel to make an affidavit to that general effect, and thereupon he, as appellee, moved to strike out the brief and argument and to dismiss the appeal. The Attorney General of this state thereupon moved the Supreme Court of the United States to substitute Boardman, the incoming sheriff, as party appellant in place of Knewel, and to permit the state of South Dakota to intervene, setting up the fact that the state was the real party in interest. The Supreme Court of the United States, on May 25, 1925, granted the motion to substitute Boardman as sheriff in place of Knewel; permitted the state to intervene; denied the applications of Knewel and of the petitioner for dismissal; reversed the decision of Judge Reeves of the District Court; and characterized the effort of the petitioner to procure a dismissal of the action through connivance with Knewel, in the following language:

"The affidavit of appellant in support of appellee's motion to dismiss discloses an obviously collusive attempt by appellant and appellee to defeat the ends of justice by dismissing the appeal without the consent of any officer representing either the state or the present sheriff, who are the real parties in interest as appellants." Knewel v. Egan, 268 U. S. 442, 45 S. Ct. 522, 69 L. Ed. 1036.

Thereafter and on June 22, 1925, the petitioner was committed to the penitentiary at Sioux Falls, S. D., to serve the 2-year sentence previously imposed upon him, whence he was released by virtue of a pardon from the then Governor of this state on December 24, 1926.

It further appears from the records of the United States District Court at Sioux Falls, S. D., that the petitioner was adjudicated a bankrupt in said court on August 22, 1921, and that the referee in bankruptcy to whom said matter had been referred, on April 19, 1922, filed findings of fact, conclusions of law, and an order requiring the bankrupt to turn over and deliver to Holton Davenport, trustee in bankruptcy, the sum of $2,895.49, adjudging that said sum had been concealed by the bankrupt, and that he was wrongfully withholding the same from his trustee. This determination of the referee was duly brought on for review before Hon.

James D. Elliott, judge of said court, who filed his opinion and decision in said matter under date of February 7, 1923. He reversed so much of the order as required the bankrupt to turn such money over to the trustee because of the fact that it failed to appear that said money continued to be in the possession of the bankrupt, but with regard to the matter of concealment of assets said opinion held in part:

"Unquestionably the record supports the findings of the referee that money and checks, the proceeds of accounts, a part of the estate of said bankrupt, were in bankrupt's hands at the time of the filing of the petition in bankruptcy, and other like sums came to his hands after the filing of the petition in bankruptcy and the adjudication of bankruptcy, the title to which had passed to the trustee in bankruptcy. That these sums were in far larger and greater amount than the $2,895.49, as found by the referee in bankruptcy. Clearly, the referee, thus far, is more than supported by the record. In other words, he might have found a much greater sum thus misappropriated by the bankrupt and still have been within the record."

And further said:

"In conclusion I may add that a fair consideration of this record discloses a willful, fraudulent concealment and disposition of assets of the estate involving, in my judgment, criminal intent and purpose on the part of the bankrupt and a clear liability on the part of those who receive such assets."

The petitioner filed his petition for discharge in bankruptcy on December 16, 1922, and on February 3, 1923, there were filed in the bankruptcy court specifications of objections to said discharge, which specifications were amended on November 13, 1923, which amended specifications set out that the bankrupt, this petitioner, destroyed and concealed accounts, records, and documents from which his financial condition might be ascertained, with the intent of concealing his financial condition and concealing transfer of his assets, and that he transferred, removed, and concealed within four months prior to the filing of his petition in bankruptcy certain assets in said objections set out with the intent of hindering, delaying, and defrauding his creditors, and concealing his assets, and making other similar objections in detail. On November 29, 1927, a petition was filed in the bankruptcy court by the

attorneys for the objecting creditor requesting the court to refer said specifications of objections to the referee in bankruptcy for the purpose of taking testimony thereon, and an order to that effect was accordingly made and entered, and thereafter and on December 17, 1927, instead of meeting those objections before the referee, the bankrupt caused to be filed in said court a petition asking leave to withdraw his petition for discharge, and such leave was accordingly granted.

We think we may fairly summarize the history and conduct of applicant as his own acts have written it in courts of record for nearly 21 years last past about as follows:

He was admitted to the practice of law in this state in 1907 in the face of objections which this court subsequently held were sufficient to have justified refusing him admittance in the first instance. Re Egan, 27 S. D. 16, 129 N. W. 365. He was disbarred for the first time less than a year thereafter on October 10, 1908 (Re Egan, 22 S. D. 355, 117 N. W. 874), and such disbarment had the considered approval of this court three years later with a different personnel (Re Egan, 27 S. D. 16, 129 N. W. 365). Commencing January 1, 1909, after his first disbarment, for a period of some 9 months, he was guilty almost weekly of grossly abusive and contemptuous language concerning the courts and judges of this state, so utterly inexcusable that almost any of those publications would in and of itself be ample justification for the disbarment of any attorney guilty of uttering the same. His first application for reinstatement after his first disbarment was denied. Re Egan, 24 S. D. 301, 123 N. W. 478. A second application for reinstatement was granted in reliance upon his retractions and apologies and his protestations that his future conduct would be beyond reproach. Re Egan, 27 S. D. 16, 129 N. W. 365. He was reinstated to practice on January 1, 1911.

██ ██ Within five months thereafter, in utter disregard of his recent promises and protestations, he made a grossly unconscionable contract with his client Kickland, and on April 4, 1916, he was disbarred for a second time. Re Egan, 37 S. D. 159, 157 N. W. 310. Upon the occasion of the second disbarment, he was found guilty upon four separate charges, entirely unconnected, covering various periods of time from 1911 to 1915, and his conduct in each one of those four matters was amply sufficient to re-

quire his disbarment. In 1920, and again in 1922, a jury of Minnehaha county twice determined that in January, 1920, applicant had committed the offense of making false and fraudulent proof in support of a claim of loss upon a contract of insurance. The first conviction was reversed and the second sustained. State v. Egan, 44 S. D. 273, 183 N. W. 652; Id., 47 S. D. 1, 195 N. W. 642. The offense of which he was thus convicted is a felony involving intent to defraud and presenting such degree of moral turpitude as to be more than sufficient to warrant the disbarment of any attorney found guilty thereof. From the sentence imposed upon him for this offense he was pardoned about two months before the expiration thereof. It is elementary that a pardon in such case is an act of clemency, and does not restore the applicant to his office of attorney, and does not restore to him that good character which he is required to possess upon being admitted to the bar and required to maintain in order so to remain. See In re Kaufmann, 213 App. Div. 555, 211 N. Y. S. 256; In re Riccardi, 64 Cal. App. 791, 222 P. 625.

It has been determined by the District Court of the United States for the District of South Dakota that the applicant after his adjudication in bankruptcy August 22, 1921, and within 4 months prior thereto, was guilty of a willful and fraudulent concealment and disposition of assets with criminal intent, to an amount in excess of $2,895, which adjudication was made in February, 1923, and appears never to have been appealed from or questioned by the applicant. His discharge in bankruptcy was objected to on the ground of his own fraud, and he appears never to have contested such objections, but withdrew his petition for discharge in December, 1927. His conduct in the matter of his own bankruptcy as thus evidenced by the unquestioned records of the bankruptcy court, which he has never seen fit to assail, is fraudulent and dishonest and exhibits such degree of moral turpitude as to warrant the disbarment of any attorney guilty thereof. In December, 1924, and in March, 1925, the applicant was guilty of a fraudulent and collusive attempt to defeat and pervert justice in the case of Knewel v. Egan, then pending in the Supreme Court of the United States, and his conduct in seeking thus collusively and dishonestly to procure the dismissal of that appeal was such as to justify the disbarment of any attorney guilty thereof. Knewel v. Egan, 268 U. S. 442, 45 S. Ct. 522, 69 L. Ed. 1036.

Seeking to be admitted to practice law in this state in the face of such a record, the applicant presents his own verified petition which we have hereinbefore set out. He also presents a petition signed by a large number of business men in Sioux Falls which is described and referred to quite fully in applicant's own petition in paragraphs VIII, IX, and XI thereof, and which bears approximately 190 signatures under the following heading:

"To the Honorable Supreme Court of the State of South Dakota, Pierre, South Dakota:

"The undersigned citizens and business interests in the city of Sioux Falls, in which city George W. Egan has resided for 20 years, being well and intimately acquainted with the life, reputation, and standing of George W. Egan, respectfully petition your honrable court that he be reinstated to the position of attorney and counselor in this state. We thus petition basing our request upon our personal knowledge of the character, habits, and qualifications of said George W. Egan, as we have personally observed him among us."

There is also attached to applicant's own petition a petition signed by some 204 members of the bar in this state, referred to and described by the applicant in paragraphs IV, V, and X of his own petition hereinbefore set out. The names of these attorneys are affixed to a petition with the following heading:

"To the Honorable Supreme Court of the State of South Dakota:

"The undersigned, lawyers practicing in the state of South Dakota, do hereby petition the Supreme Court of the state of South Dakota to reinstate Mr. George W. Egan of Sioux Falls, S. D., as an attorney of this state.

"And we respectfully call your attention to the following facts: That Mr. Egan was disbarred by this court in April, 1916; that for over 11 years he has been deprived of the right to practice law in this state, and unable on that account to practice law in any other state of the Union; that he is now 52 years of age and that he has a wife dependent upon him for support; that he has no property and has been in poor health for a number of years last past; that he is not fitted to earn a living in any other manner. That we feel the ends of justice will be more nearly attained if he is now reinstated as an attorney and allowed to practice his profession."

■ There are also annexed to applicant's petition three physicians' affidavits reciting, in substance, that he suffers from duodenal ulcer which has previously caused severe hemorrhages, and "that said Egan is not well and is weak and is subject to recurrent attacks of high blood pressure and may at any time have recurrent attacks of hemorrhages." With reference to the affidavits of the physicians, we confess ourselves unable to see how they can cast any light upon the question of the present moral fitness of the petitioner to be admitted to practice law, and we can see in them only an appeal to sympathy of the members of this court, the propriety of which can hardly be defended.

■ With reference to the admissions, regrets, and promises contained in the petition of the appellant himself, we have to say that his apologies and regrets are expressed in language much like that in his similar statement to this court in 1910. The recognition of his obligation to those willing to assist him in his effort for reinstatement and his pledges as to his future conduct were as eloquent and emphatic in 1910 as they are at this time. In 1910 the then judges of this court, perhaps against their better judgment, accepted at face value these promises and representations of the applicant so eloquently and movingly phrased and, relying thereon, readmitted him to practice. Within 5 months the confidence thus reposed in the applicant was grossly violated. The subsequent conduct and history of the applicant has not been such as to tend to convince us that a present reliance upon his protestations would be less likely to be abused than it was in 1910.

■ With reference to the petition signed by the business men, it is unverified, and we have no means of knowing how much any signer actually knows of the history and conduct of the applicant; and in proportion as the responsibility of such signers with reference to the question presented to us is extremely slight, so they can the more readily yield to a natural feeling of sympathy for the applicant in his present physical and financial condition and in the light of what he has undoubtedly suffered. The signers of that petition recite that they have known the applicant for 20 years and base their request for reinstatement upon their personal knowledge of his character, habits, and qualifications from their observation of him during that period. We have previously set out in some detail the record history of applicant for the past 20

years, and we cannot escape the conclusion that the signers of this petition have been extremely unobservant during that period, or have forgotten much, or are moved by sympathy rather than honest judgment upon the facts, or that they base their opinion upon an extremely low standard as to the moral character which should be required as a prerequisite to admission to practice law.

The propriety of presenting unverified petitions to courts, without opportunity to examine the petitioners or question them as to their means of knowledge, or basis of judgment, or the manner in which their signatures were procured, seems not often to have been questioned in proceedings of this sort. That it does not stand beyond question is evidenced by the recent holdings of the Supreme Court of Wisconsin in the case of In re Stolen (Wis.) 214 N. W. 379, opinion affirmed on rehearing, 216 N. W. 127. The latter opinion in particular is well worthy of careful study by the bar.

Perhaps it ought to be possible to assume that every signature to such a petition is attached without any influence of solicitation; that every signer thereof has full knowledge of all the facts; that he is thoroughly conversant with the standard of conduct that ought to be applied to the facts as a basis for opinion; that he is a man of prudence and good judgment; and that his signature represents no more and no less than his candid, unsolicited, and considered opinion arrived at solely by the application of his sound judgment to existing facts with which he is well acquainted, measured in accordance with a standard as to which he is fully advised, uninfluenced by sympathy, personalities, or other considerations. Unfortunately we are compelled to recognize as a practical matter that a generally signed petition of any sort rarely, if ever, even approximates these assumptions. Our everyday experience and observation cannot but convince us that the procuring of signatures to a petition for almost any conceivable purpose is a comparatively simple matter; that in fact it needs but little more than the good offices of some individual who will interest himself to the extent of carrying the document from place to place and asking signatures. This sort of petition is about as weak a foundation, considered as a basis for the judicial determination of a question of fact, as could well be imagined. And the courts to whom such documents have been presented have had frequent occasion so to announce.

"With these views in mind, let us examine the showing made by petitioner in the present proceeding. We first notice a paper in the following form:

"To Whom it May Concern: We, the undersigned, employees of the Los Angeles Railway Corporation, and we and each of us personally knowing W. H. Stevens of Los Angeles, Cal., said Stevens having worked as a conductor, an inspector and a supervisor with us, have had an opportunity of observing and have observed the conduct of said W. H. Stevens. That we verily believe he is honest, industrious, conscientious and of good moral character, and we verily blieve that if he were reinstated as a member of the bar of the state of California, that it would be for the best interests of all concerned."

"This document bears the signatures of 601 persons, but we can see no force in it, as affecting the question now before us, except the force of numbers, and that, it must appear at once, alone amounts to nothing. Looking to the substance of the paper which has been so generously signed, we cannot see that we are to be aided by it. If we grant for the time being that there could be anything in the observed conduct of petitioner as 'a conductor, an inspector and a supervisor' which would enable any single and unremitting scrutinizer of that conduct to determine from it whether he would make an honest and a reliable lawyer—a point, however, which we reserve for further mention—we cannot perceive how this array of 600 persons could have had petitioner so closely under their observation as to enable them, en masse, and with no showing of fact except this general statement en masse, to resolve that question. Recognizing the laudable willingness of the signers of the paper to help a fellow employee out of difficulty, and with great respect for their honesty of purpose in appending their names to the document, we can ascribe no weight to the presentment made by it." In re Stevens, 59 Cal. App. 251, 210 P. 442.

"It is also urged that, in view of the testimony offered by many reputable members of the bar and citizens of King county, the order of disbarment should be set aside. The testimony, however, of these witnesses, while commendable for the forgiving spirit therein shown, was not based upon sufficient facts to justify any conclusion that there should be a reinstatement." In re Gowan, 141 Wash. 523, 251 P. 773.

"We appreciate that Mr. Clark has presented to us the letters of many men, laymen as well as lawyers, urging his reinstatement. It is to his credit that a large number of his acquaintances in ·Genesee county, where he resides, vouch for the uprightness of his life since his disbarment. Many prominent lawyers testified before the referee in the disbarment proceeding to his high standing, and yet Clark did not deny the charges against him, culpable as they were. The witnesses in his behalf and the men now advising his restoration to practice may be influenced mainly by sympathy for the petitioner. They perhaps overlook the fact that the question has a broader significance than its personal aspect. If the possible benefit to the petitioner were the only effect of our action to be considered, we might yield to the recommendations and permit him to be ·reinstated. The effect of such a decision upon the profession, however, must be taken into consideration. His restoration· would indicate a tendency on the part 'of this court to treat lightly the gravest of offenses deliberately committed and persistently justified." In re 'Clark, 128 App. Div. 348, 112 N. Y. S. 777.

See, also, Re O'Connell, 199 Cal. 538, 250 P. 390, 48 A. L. R. 1232.

"We do say, however, from a consideration of all of them, that no disbarred attorney can be reinstated in his old place in the profession except upon a showing of facts, aided perhaps by affidavits or even letters of well-known persons, particularly lawyers and judges, expressing a conviction, based on a statement of facts, that the petitioner for reinstatement has reformed, and all demonstrating that he is fit to reassume the ermine which he has already polluted. Without a statement of facts, affidavits and letters are of ·slight, if any, value." Re Cate, 60 Cal. App. 279, 212 P. 694. In re Simpson, 11 N. D. 526, 93 N. W. 918.

See, also, Re Morrison, 45 S. D. 123, 186 N. W. 556, at pages 129, 130, of the state report.

The petition of the attorneys stands perhaps in a somewhat different position from a petition by laymen as is indicated in some of the cases cited above. These attorneys are members of the bar of this court and in a very real sense officers of the court. By the oath they took they owe a definite duty to this court which does not rest to the same degree upon other citizens conceding all the duties and obligations of general good citizenship. But

the very phraseology of the petition signed by the attorneys in the matter before us indicates upon its face that it is based to a considerable extent upon the theory of sufficiency of punishment and upon a perfectly natural sympathy for the applicant.

Some of the signers of this petition have since stated to one or more members of the court that they did not in fact believe that the applicant should be readmitted to practice and did not wish to be understood by this court as so believing, but that they had signed the petition because it was presented to them under circumstances when it would have been embarrassing to refuse. There are a number of signers upon this petition who, we are well convinced, have so little knowledge of the details of the applicant's conduct during the past 20 years that their opinion as to whether he should or should not be admitted to practice at this time is utterly worthless. Some signers of the petition have since stated to this court that they now regretted signing and desired their names to be considered withdrawn. We are of the opinion that, in a matter of this sort, a letter written and signed and presented to us by an attorney of this court is of at least as much evidentiary value as his expression of opinion without statement of fact in the form of a signature to an unverified petition. Letters from several attorneys addressed to this court cast considerable doubt upon the method of obtaining signatures to this petition, and in the course of one such letter presented in this case this statement is made:

"Mr. Egan secured the signatures of many lawyers to his petition here in Sioux Falls by misrepresentation, representing that he had a chance to get into the office of ———, at Chicago, and that he did not intend to practice law in this state. At Parker and elsewhere, however, he told the lawyers that he would practice law in Sioux Falls. Thus it is quite evident, while he was misleading Sioux Falls lawyers by appealing to their prejudices against him, that he at the same time appealed to the prejudices which exist in some parts against Sioux Falls lawyers. This is only a sample of the kind of misrepresentation and appeal to prejudice he resorts to. Other appeals are equally as unworthy. He also appealed for sympathy to many by stating that he was broken financially and in health, and that he had no other means of making a living."

Another attorney states:

"Mr. Egan, in soliciting the writer to sign, stated that he

would be glad to recommend people who came to him with business he could not handle, to go to those who signed his petition."

. Another attorney soliciting the readmission of the applicant writes:

"None of us question the propriety of his disbarment, but feel that he has learned his lesson, and would like for him to have an opportunity to again provide for his family, and also his decrepit and paralyzed father-in-law, Mr. ————, who is now dependent upon him.

"If Egan should ever go astray again, I think I can assure you that we will never again ask for his readmission. I am satisfied that he would like to remove to another state, but of course cannot be admitted elsewhere so long as he has been disbarred here."

The names of some of the prominent and long-established leaders of the bar in Minnehaha county, where the petition appears to have been most generally circulated, are conspicuous by their absence, and a number of letters from lawyers and laymen have been presented to us protesting against the granting of the application.

We believe that there are unquestionably some signers of this petition, though we are persuaded that they constitute a minority and not a large minority, who are fully informed as to the history and record of the applicant, and who as lawyers know and appreciate the standard of conduct which should be required of attorneys, and who yet sincerely and conscientiously believe that the applicant should be readmitted. To them we can only say that we are unable to bring our judgment to accord with theirs.

To those who signed the petition carelessly, or without knowledge of the facts, or solely because of a natural feeling of sympathy, or in disregard of their own actual opinion or because it would have been embarrassing to refuse, we think we should say that in so doing they were not only unfair to the applicant, but unmindful of their obligations as attorneys and officers of this court.

From the entire record before us it appears that the applicant is a man gifted with great and unusual natural ability, and, as he himself said (September 21, 1910, in this court), "educated beyond the lot of ordinary men." He is a writer and speaker of great talent, a man of strong and magnetic personality, and ap-

pears always to have had a large and loyal personal following. If he could but have rightly employed his natural faculties and acquired attainments, there is no limit to what he might have accomplished, but as his talents were great, so likewise was his responsibility, and he has grievously abused it. We believe his record of disbarments and readmissions and applications for readmission is beyond any parallel in the reported cases. He himself has made a record for 20 years that must confront him now. He has been twice disbarred upon ample cause and stands forsworn of his solemn promises made to this court upon the occasion of his last readmission. Year after year during the past 20 years he has been guilty time and again of conduct which has shown him beyond the shadow of a doubt to be lacking in that moral character requisite to one who would be admitted to the practice of law.

In the face of his past record there is nothing before us in his behalf excepting the petitions he has presented based in great part, we are convinced, upon a natural feeling of sympathy. There is nothing here presented to prove or tend to prove that those elements of character, including honesty and a disposition toward fair dealing, the lack of which he has so often and so long evinced, have now been supplied.

Character is not made in a day. Its structure, either good or bad, is no instantaneous matter. This truth was recognized by applicant himself when, on September 1, 1909, he stated to this court:

"It is known by all students of psychology and criminology that no man becomes suddenly bad. In the record of him who commits a crime can be traced a long line of infractions against the state. He who has been tried and tempted and withstood temptations for many years will not find temptations so hard to overcome. To the honest mind there is a strong presumption in favor of such a one. He who is good six days in the week has all the chances in his favor for the Sabbath. When one is charged with an offense, it is competent and highly proper to investigate all his past and every fact and circumstance of his life, and if he is found honorable and sincere he has a standing before the honest open mind that cannot be lightly swept aside. I solicit such investigation at the hands of this court. I demand it, sirs, and I am here to submit to any cross-examination and answer any questions,

explain any circumstance, about which this court may desire to inquire. If, on the whole, my life is found to be in accord with the high credentials filed with this court, I insist, then, that this body shall give me the benefit that such standing merits and proceed to investigate my conduct since I came within the state."

This statement may be granted as generally true, but in the same sense it is equally and just as generally true that no man becomes suddenly good.

We cannot avoid the conclusion that the conduct of the petitioner as he himself has exhibited it for the past 20 years is a sounder criterion as to his present character and as to his probable future conduct than are the bare opinions of the petitioners whose names he has here filed unverified, based upon no statement of facts, without any showing as to the manner of their solicitation, their knowledge of the facts, or their standard of judgment.

The application for reinstatement must be denied. In the face of the applicant's own record from 1907 down to 1927, we cannot do otherwise. The applicant has our sympathy as well as that of his petitioners, and it would have been much easier to have ruled this matter otherwise. We echo the sentiment expressed in the words of Owen, J., in Re Stolen( Wis.) 216 N. W. 127:

"In conclusion, we may say that it is easy for those not charged with responsibility to act in accordance with their sympathies. Those charged with responsibilities are frequently at war with their sympathies. But if they could not suppress their sympathies they would be unfit to be charged with official duties. The members of this court who joined in the judgment of the court are not barren of the usual human sensibilities. They took no pleasure in pronouncing the judgment in this case. A different judgment would have been far more in consonance with their sympathies, but, unlike the petitioners of the Dane county bar, duty prevented the indulgence of their sympathies. We are content to submit the disposition of this case to the calm and impartial judgment of time."

BURCH, P. J., and POLLEY, SHERWOOD, and BROWN, JJ., concur.